**THOMPSON TRADING, LTD.**

v.

**ALLIED BREWERIES OVERSEAS TRADING LTD., Associated Importers, Inc., and Hiram Walker, Inc.**

v.

**William THOMPSON.**

**Civ. A. No. 88–0333 L.**

United States District Court,
D. Rhode Island.

Oct. 11, 1990.

Charles P. Cavas, Hodosh, Spinella & Angelone, Providence, R.I., for plaintiff.

John Voorhees, Tillinghast Collins, & Graham, Providence, R.I., Theodore Voorhees, Jr. and Eric S. Koenig, Covington & Burling, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is presently before the Court on the motion of all defendants for summary judgment as to all remaining counts of the Second Amended Complaint (Counts I, II, III and V) and the motion of defendant, Allied Breweries Overseas Trading Ltd., (ABOT), for summary judgment as to Counterclaims IV, V, and VI.

*Factual Background*

This Court has previously published two decisions concerning jurisdictional issues with respect to this matter. *See Thompson Trading Ltd. v. Allied Lyons PLC,* 123 F.R.D. 417 (D.R.I.1989); *Thompson Trading Ltd. v. Allied Lyons PLC,* 124 F.R.D. 534 (D.R.I.1989). Although the factual background of this controversy is spelled out in those opinions, a summary of facts relevant to the current motions is appropriate here.

On November 11, 1985, ABOT, a British corporation, entered into a distribution agreement ("Agreement") with Thompson Trading Ltd. ("Thompson Trading"). Under the Agreement ABOT granted Thompson Trading the exclusive right to import and distribute Double Diamond Pale Ale in the United States. The fifth paragraph of the Agreement contained the following provision regarding Thompson Trading's right to assign:

> Thompson shall not charge nor assign its rights or obligations under this appointment to any third party to which Allied [ABOT] shall not previously have given its consent in writing such consent not to be unreasonably withheld in the case of a third party which Allied [ABOT] does not consider prejudicial to its interests.

After a tenuous existence of nearly two years, subsidized frequently by ABOT, Thompson Trading decided to exercise its assignment rights.

In a meeting held in August of 1987, ABOT officials were apprised of Thompson Trading's concern that its financial condition might cause it to go out of business. In the ensuing months both Thompson Trading and ABOT searched for a buyer of the rights to Double Diamond.

Preliminary negotiations were held in October of 1987 between Thompson Trading's agent and representatives of Simon Levi Company Ltd. ("Simon Levi"), a California corporation engaged in the wholesale spirits business. ABOT officials were present at some of the meetings between Thompson Trading and Simon Levi during an industry convention in Baltimore. Immediately following the convention, ABOT encouraged Thompson Trading to pursue the Simon Levi negotiations.

On November 4, 1987 Thompson Trading and Simon Levi reached a tentative agreement regarding the Double Diamond rights. Two days later ABOT officials contacted Simon Levi and made arrangements for Simon Levi officials to visit the ABOT offices in the United Kingdom. The visit occurred on November 19 and 20. ABOT

maintains that it came away from the meeting with an unfavorable impression of Simon Levi's ability to manage the distribution of Double Diamond. Thompson Trading contends that the negotiations were successful. In fact, ABOT and Simon Levi reached agreement on several points, all subject to contract, and further meetings were scheduled for the first week of December in California.

On November 20, Simon Levi and Thompson Trading executed a "30 day letter of intent" in which the companies agreed to the transfer of the distribution rights subject to ABOT's approval of Simon Levi. The 30 day letter of intent contemplated that Simon Levi would pay Thompson Trading $275,000.00 for the rights.

On November 26, ABOT notified Simon Levi that the California meeting was cancelled due to the fact that one of ABOT's parent corporations (Allied Lyons PLC) had acquired the remaining outstanding interest in the Hiram Walker group of companies.[1] ABOT cited its need to reconsider product distribution in the United States now that a Hiram Walker beer distributing company, Associated Importers, was a member of the family.

Despite these events, ABOT sent a draft contract to Simon Levi two weeks later. Furthermore, ABOT continually postponed its decision about whether to consent to Thompson Trading's assignment to Simon Levi. In late January of 1988, ABOT and Associated Importers officials met with Thompson Trading to discuss the possibility that the Double Diamond rights should go to Associated Importers. Shortly thereafter Associated Importers sent Thompson Trading an offer for the rights for a package of financial benefits worth substantially less than the Simon Levi offer. When Thompson Trading attempted to negotiate those terms, it was informed by ABOT that the Associated Importers offer was nonnegotiable and that if it was not accepted, then the Agreement between ABOT and Thompson Trading would be terminated. Thompson Trading refused to accede, and on April 12, 1988 Thompson Trading received a formal termination notice from ABOT.

*Procedural Background*

This Court's last written opinion on this matter was on a motion by former defendants, Allied Lyons PLC and Hiram Walker–Gooderham & Worts, Ltd., to reconsider an earlier opinion which denied their motion to dismiss for lack of in personam jurisdiction. Since that time, several changes in parties and claims have occurred.

On September 21, 1989, plaintiff filed a Second Amended Complaint which added Hiram Walker, Inc. as a defendant.[2] This complaint also withdrew a termination/breach of contract claim alleged in the first complaint. The operative complaint now focuses on ABOT's duty to consent to Thompson Trading's attempted assignment of its rights to Simon Levi.

On June 18, 1990 the parties entered into a dismissal stipulation. Thompson Trading voluntarily dismissed with prejudice Counts II and V of its Second Amended Complaint as against defendants Allied Lyons PLC, Allied Breweries Ltd., and Hiram Walker–Gooderham & Worts, Ltd. Thompson Trading also voluntarily dismissed with prejudice in its entirety Count IV concerning the Rhode Island Fair Dealing Law. Thus, there now are three defendants in this matter: ABOT, Associated Importers, and Hiram Walker, Inc.

All three defendants moved for summary judgment on the remaining counts of the Second Amended Complaint on April 3, 1990. ABOT also moved for summary

---

1. Defendants allege that Associated Importers was a wholly owned subsidiary of Hiram Walker & Sons, Inc., which was in turn, wholly owned by Hiram–Walker–Gooderham & Sons, Inc. Plaintiff has dismissed all counts against Hiram Walker–Gooderham & Worts, Ltd., and has not named nor served Hiram Walker & Sons, Inc. in this controversy. Instead, plaintiff named and served Hiram Walker, Inc. as a

party defendant. That company alleges that it has absolutely no involvement in the dispute. At this juncture in the litigation, the parties have not provided sufficient material to the Court to enable it to rule on this contention.

2. See footnote 1.

judgment on Counterclaims IV, V, and VI. Thompson Trading filed its opposition memorandum on June 11, 1990. The movants filed reply memoranda on June 26, 1990. Three days later oral argument was heard and the matter was taken under advisement. It is now in order for decision.

Discussion

Each motion for summary judgment can only be granted if there exists no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Federal Rules of Civil Procedure 56. It is this Court's responsibility to determine "whether the nonmovant's most favorable evidence and the most flattering inferences which can be drawn therefrom are sufficient to create any authentic question of material fact." *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987).

Breach of Contract Claim

The four remaining counts in the Second Amended Complaint revolve around whether ABOT unreasonably withheld its consent to Thompson Trading's desired assignment to Simon Levi. Count I alleges that ABOT's failure to consent constituted a breach of contract under the ABOT–Thompson Trading agreement. ABOT contends that Thompson Trading was insolvent, had defaulted under the terms of the Agreement, and therefore had no rights to assign.

■ Thompson Trading argues that ABOT is precluded from arguing default as a defense because it was not specifically pled as an affirmative defense. Rule 8 of the Federal Rules of Civil Procedure requires certain affirmative defenses to be specifically pled and enumerates several types of defenses. Default is noticeably absent from this list. In addition, ABOT's answer in this matter did plead nonperformance sufficiently to give Thompson Trading notice. Thus, ABOT is not precluded from arguing default as a factual defense to Count I.

1. *Waiver of Insolvency*

■ ABOT contends that Thompson Trading defaulted under the terms of the Agreement and therefore had no power to assign rights to Simon Levi. Under this theory, ABOT had every right to object to Thompson Trading's purported assignment, not just the right to reasonably withhold consent.

Whether or not Thompson Trading was in fact in default is presently unclear. Also in dispute is the parties' duty under the Agreement to give notice of default. Indeed, it was not until April 4, 1988 that ABOT sent a notice of termination to Thompson Trading. In any event, the evidence indicates that if Thompson Trading was in default in August of 1987 ABOT has, by its own actions, waived its rights to claim default. Under Rhode Island law, " '[w]aiver is the voluntary intentional relinquishment of a known right.' " *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.*, 488 A.2d 723, 725 (R.I.1985) (quoting *Pacheco v. Nationwide Mut. Ins. Co.*, 114 R.I. 575, 577, 337 A.2d 240, 242 (1975)). It is certainly clear that ABOT actively encouraged Thompson Trading's efforts to secure Simon Levi as an assignee after the time ABOT claims Thompson Trading was in default, thus giving rise to a strong inference of waiver.

Plaintiff relies on, and this Court accepts, the reasoning in *Morrison v. International Harvester Co.*, 204 F.Supp. 6 (D.Colo.), *appeal dismissed,* 306 F.2d 492 (10th Cir.1962). In *Morrison,* the jury returned a verdict in favor of the plaintiff who alleged that the defendant (IH) intentionally interfered with the plaintiff's prospective sale of his business to a third party. IH moved for a new trial or in the alternative a judgment notwithstanding the verdict. As grounds, IH relied on the express nonassignability clause contained in the agreement between the parties. The district court denied the motion holding that there was sufficient evidence of waiver of the nonassignability clause. This evidence consisted of testimony showing that IH was notified of the proposed sale, had assisted in the negotiations, and had found the potential buyers satisfactory.

The only material difference in the case at bar is that ABOT now maintains that it never considered Simon Levi satisfactory. That allegation however was not known by either Simon Levi nor Thompson Trading until Associated Importers was thrust forward after Allied Lyons PLC's acquisition of the Hiram Walker group. By all outward appearances, Thompson Trading was justified in believing ABOT considered Simon Levi a bona fide contender for the distribution rights.

The undisputed facts here indicate that any insolvency by Thompson Trading was waived by ABOT, just as IH waived the nonassignability clause in the *Morrison* case. At the very least there is a factual issue as to whether waiver occurred which must be resolved by the jury. See *Haxton's of Riverside, Inc.*, 488 A.2d at 725–26.

After ABOT officials met with Thompson in August, 1987 a search began for an assignee. When Thompson Trading's efforts turned up Simon Levi, ABOT officials participated in preliminary negotiations. Later, ABOT arranged for Simon Levi representatives to travel to the United Kingdom for additional meetings. A draft contract was signed and further plans made for ABOT people to travel to California to work out more details. All of these events occurred after the time ABOT now claims Thompson Trading was insolvent. The factfinders in this case may well ask this question: if ABOT truly considered Thompson Trading to be insolvent and without rights to assign, why did it spend time assisting Thompson Trading in its efforts? The likely answer is that ABOT waived its right to declare a default.

### 2. *Reasonableness of Withholding Consent*

The central issue in this matter boils down to whether ABOT unreasonably withheld its consent to Thompson Trading's proposed transfer of its distribution rights to Simon Levi. The defendants contend that reasonable grounds existed. They cite three decisions to support the argument that an entity's concern about a proposed transferee's business skills and financial ability constitute a "reasonable" ground for withholding consent. These decisions would be dispositive but for the notable lack of contrary evidence presented by the opposing party in each case. See *Sun Refining & Marketing Co. v. Brooks–Maupin Car Centers*, 1989 Bus. Franchise Guide (CCH) ¶ 9325, at 19,770 (E.D.Mich. 1988) ("all record evidence supports the conclusion that Sun refused Kaakarli in a reasonable and legitimate exercise of its business judgment. There is simply nothing in the record ... to the contrary and, accordingly, no disputed issue of material fact.); *Town & Country Ford, Inc. v. Ford Motor Co.*, 1986 Bus. Franchise Guide (CCH) ¶ 8660, at 16,747 (N.D.Ga.1985) ("The uncontroverted facts in this case show a strong and legitimate business interest for Ford to withhold approval of plaintiffs' prospective replacement dealer."); *Simonds Chevrolet, Inc. v. General Motors Corp.*, 564 F.Supp. 151, 152–53 (D.Mass.1983) ("[P]laintiff has not challenged and the record otherwise supports" the defendant's four independent justifications for its refusal to consent to an assignment.)

In this case Thompson Trading has challenged the facts. To prove ABOT unreasonably withheld consent, it points to ABOT's active encouragement of the Simon Levi negotiations discussed earlier. Plaintiff also alleges that beginning in March of 1987 ABOT began discussions with Associated Importers regarding Associated's possible acquisition of Double Diamond's distribution rights. Thompson Trading contends that these early discussions were part of "Project Reagan," ABOT's surreptitious term for its program of developing a new British beer concept for the United States. ABOT contends that Project Reagan was concerned with a separate product named John Bull beer, not Double Diamond.

Thompson Trading further points to inculpatory language in two ABOT memoranda to question ABOT's reasonableness in withholding consent. The first is an in-house memo directed to ABOT's Chairman dated November 12, 1987, after ABOT

learned Thompson Trading and Simon Levi had reached agreement.[3] The second is a file memo from ABOT's in-house counsel dated January 28, 1987, which directly concerns the promissory note that is the subject of two counterclaims.[4]

Plaintiff further argues that Simon Levi had the financial ability and business acumen to distribute Double Diamond nationally. ABOT has cited the following four reasons, stemming from the November 19 and 20, 1987 United Kingdom presentation, why its refusal to consent to Thompson Trading's attempted assignment to Simon Levi was reasonable: (1) Simon Levi had no existing beer importation business; (2) ABOT officials were skeptical of Simon Levi's true interest in British Beer; (3) ABOT officials were unimpressed by Simon Levi's proposed manager for importation; and (4) ABOT preferred selecting a company within the Allied Lyons/Hiram–Walker organization, all other things being equal. ABOT contends that Simon Levi's successful efforts as a beer distributor since 1988 are immaterial to a determination of the reasonableness of ABOT's actions in this matter. ABOT also argues that several statements by ABOT officials expressing optimism about Simon Levi occurred before the United Kingdom presentation.

However, Thompson Trading has also produced several ABOT documents dated shortly after the U.K. presentation that outline future ABOT–Simon Levi negotiations. These documents are noticeably silent with respect to any ABOT concerns regarding Simon Levi's financial ability to carry out a distribution agreement. Furthermore, these documents are contemporaneous with ABOT's preliminary agreement with Simon Levi, which was subject to contract, and ABOT's plans to continue negotiations, which were terminated by news of the Allied Lyons' acquisition.

■ A genuine issue of material fact exists as to whether ABOT's refusal to consent to the Simon Levi assignment was reasonable. Where there exist disputed facts concerning the reasonableness of withholding consent to an assignment, that issue should be decided by the trier of facts. *Cf. In re Pioneer Ford Sales, Inc.,* 729 F.2d 27, 30 (1st Cir.1984) (holding that district court's determination that consent was unreasonably withheld under R.I.Gen. Laws § 31–5.1–4(C)(7) (1982) was clearly erroneous in light of fact that potential assignee had a "history of losses" and was unable to meet the required franchise working capital amount).

Breach of Duty of Good Faith and Fair Dealing

In Count III plaintiff alleges ABOT breached the duty of good faith and fair dealing implicit in the Agreement. Both parties cite *Psaty & Fuhrman, Inc. v. Housing Authority,* 76 R.I. 87, 93, 68 A.2d 32, 36 (1949) for the following language: "If a party to a contract with such a clause acts honestly within the fair and legal import of its terms, he cannot be deprived of the benefit thereof unless his conduct indicates bad faith or some other tortious intent, as every contract implies fair dealing."

■ As previously discussed, a jury question exists here concerning whether ABOT's acts were within the terms of the Agreement; that is "reasonable." If the jury finds that ABOT acted unreasonably, then under *Psaty,* ABOT could be found liable for breaching its implied duty.

3. The memo contains the following language:
The sale requires our endorsement, but contractually we cannot withhold this "unreasonably".
The price being paid to Thompson is $275,000 or £150,000.
Whilst it must be in Allied–Lyons interests to give the brand to Hiram Walker, this will cost Allied Breweries or Hiram Walker £150,000 to at least match the offer. One may say that we should find "reasons" why the Simon Levi offer should be refused. This can be done, but I would refer you to [in-house counsel's] opinion which is that expensive litigation would be likely to follow.

4. This memo contains the following language: "It would also perhaps be useful to have a copy of whatever letter you eventually managed to screw out of Thompson so far as possible reimbursement from him in the future is concerned."

The Rhode Island Supreme Court has stated that the implied duty exists between parties "so that the contractual objectives may be achieved." *Ide Farm & Stables, Inc. v. Cardi,* 110 R.I. 735, 739, 297 A.2d 643, 645 (1972). ABOT maintains that no contractual objective was interfered with in this dispute because Thompson Trading had no contractual right to compensation equal to the $275,000.00 offered by Simon Levi. Thompson Trading counters that the overall contractual objective in the distribution agreement was for both ABOT and Thompson Trading to make a profit. In essence, plaintiff alleges the assignment clause existed in order to provide it with an opportunity to cash in on the value of the distribution rights, subject to ABOT's consent.

Tortious Interference with Business Relationship

In Count II plaintiff alleges that defendants intentionally interfered with the business relationship between itself and Simon Levi. The Rhode Island Supreme Court has expressly recognized the tort of interference with prospective contractual relations. *Federal Auto Body Works, Inc. v. Aetna Casualty & Sur. Co.,* 447 A.2d 377 (R.I.1982). The elements of the tort are: (1) the existence of a business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; (5) damages to the plaintiff. *Messolella v. City of Providence,* 508 A.2d 661 (R.I.1986). Thompson Trading points to the 30 day letter of intent between itself and Simon Levi as evidence of the existence of an impending business relation. It alleges that a jury issue exists as to whether ABOT "intended to do harm without legal justification." *Id.* at 670.

Defendants contend that because ABOT held a contractual right under the Agreement with plaintiff to consent to any assignment, and because the 30 day letter expressly made ABOT's approval a condition precedent to Simon Levi's obligation, no intentional interference claim exists.

Defendants' basic argument is that invocation of a contractual right can not as a matter of law constitute tortious interference. After reviewing defendants' arguments, and construing the evidence in the light most favorable to the nonmoving party, this Court concludes that defendants' position is not supportable. A more appropriate statement of the law is that mere invocation of a contractual right does not as a matter of law negate a tortious interference claim. *See Morrison,* 204 F.Supp. at 8.

Defendants cite three opinions in support of their position: *Genet Co. v. Annheuser–Busch, Inc.,* 498 So.2d 683 (Fla.Dist.Ct. App.1986); *Birkenwald Distributing Co. v. Heublein, Inc.,* 55 Wash.App. 1, 776 P.2d 721 (1989); and *Walner v. Baskin–Robbins Ice Cream Co.,* 514 F.Supp. 1028 (N.D.Tex. 1981). None of these decisions control the matter under consideration here.

In *Genet* plaintiffs alleged that defendant Annheuser–Busch (A–B) tortiously interfered with a contract executed between plaintiffs and Lopez, an A–B wholesaler, for the transfer of the A–B wholesalership. The appellate court affirmed the trial judge's grant of summary judgment in defendant's favor. Its opinion was based squarely on Florida law which states that "a cause of action for tortious interference does not exist against one who is himself a party to the business relationship allegedly interfered with." *Genet,* at 684.

Even if the *Genet* opinion represented binding authority for this Court to follow, it would still be inapplicable. The plaintiffs in *Genet* were in the same position as Simon Levi in this controversy; that is prospective purchasers of rights subjected to another party's consent. Yet, it is not Simon Levi that is the plaintiff in the case at bar. Thompson Trading is the plaintiff, an entity in the same position as the non-party Lopez in the *Genet* dispute.

The business opportunity which Thompson sought was the chance to earn approximately $275,000.00 from Simon Levi for the sale of its distribution rights. ABOT was not the source of Thompson Trading's business opportunity as A–B was of the *Genet*

plaintiffs' opportunity. The *Genet* plaintiffs sought an A–B wholesalership and to enter into a contractual arrangement with A–B. Thompson Trading sought money from a third party for the rights it held. ABOT certainly was the reason Thompson Trading was in the position to entertain the opportunity with Simon Levi, but it would be beyond the scope of *Genet* to hold that ABOT was the source of Thompson Trading's business opportunity.

The *Genet* court also noted that the record failed to disclose any evidence that the defendant acted out of malice when it refused to consent to the sale to the plaintiffs. It noted that the "only evidence in the record establishe[d] that A–B based its decision to disapprove the proposed transfer entirely on business considerations." *Id.* at 685. The allegations and exhibits in the current matter at least raise an authentic question of fact concerning ABOT's basis for its decision to withhold consent of the assignment to Simon Levi.

The defendants next cite *Birkenwald Distributing Co. v. Heublein, Inc.*, 55 Wash.App. 1, 776 P.2d 721 (1989) to support their contention that no claim for tortious interference with business relations exists in this matter. In that case, plaintiff-wholesaler alleged defendant's refusal to approve a proposed transferee, and the defendant's subsequent selection of another, constituted intentional interference. The Washington Court of Appeals affirmed the dismissal of the claim on two grounds.

In an opinion based on Washington law, the Court held that plaintiff "failed to raise an inference of improper purpose or unlawful means" and that "it lost nothing to which it was entitled." *Id.* 776 P.2d at 727.

■ In *Birkenwald,* the relationship between the supplier and the distributor was terminable at will. The court noted that there was no evidence pointing to bad faith on the part of the defendant in terminating the relationship. Thus, the business transaction the defendant undertook after the plaintiff's termination, was one in which the plaintiff had no valid business expectancy or contractual relation. Here, Thompson Trading clearly had a legitimate business expectancy as evidenced by the 30 day letter of intent and its conditional right to assign under its Agreement with ABOT.

The *Birkenwald* court also held that no intentional interference occurred. It stated, "nothing in the record suggests that Heublein intended to harm Birkenwald." *Id.* Again, in the case at bar, a genuine question of fact exists as to whether the defendants shared benign intentions or harbored an intent to harm plaintiff.

■ The defendants finally rely on *Walner v. Baskin–Robbins Ice Cream Co.*, 514 F.Supp. 1028 (N.D.Tex.1981), a case involving a franchisor's refusal to consent to the franchisee's attempted transfer of the franchise. Under the Texas law of interference with a contract, a claimant must show that the interference was "willful and malicious." *Id.* at 1031. This heightened requirement is absent from the necessary elements under Rhode Island law. *See Messolella v. City of Providence*, 508 A.2d 661 (R.I.1986) (discussed *supra*). The *Walner* court further held that "Once it is established that [the defendant] possessed the right to disapprove a transfer, contract law permits [the defendant] to exercise that right without regard to good will or motive." *Walner* at 1031. Although this result is apparently acceptable in Texas, there is no indication the Rhode Island Supreme Court would follow suit. Furthermore, motive is a relevant factor here because the ABOT–Thompson Trading agreement expressly stated that consent could not be withheld *unreasonably*. Evidence of ABOT's motivation in withholding consent to the assignment certainly can be considered by the factfinders in this case. In short, a genuine issue of fact exists in this dispute concerning whether the defendants' actions constitute an intentional act of interference. There can be no legal justification in *unreasonably* withholding consent to an assignment. Although the means employed appear innocent, the alleged resulting interference may still be improper. Restatement (Second) of Torts § 767 comment c (1979). This matter is analogous to the situation in *C.N.C. Chemical Corp. v. Pennwalt Corp.*, 690 F.Supp.

139 (D.R.I.1988). There the Court held that the initiation of a lawsuit without probable cause could constitute improper interference. *Id.* at 143. Here, the invocation of a contractual right, if found in fact to be unreasonable, can also constitute improper interference.

### Conspiracy

■ In Count V of the Second Amended Complaint, plaintiff alleges that ABOT, Associated Importers, and Hiram Walker, Inc. conspired to tortiously interfere with Thompson Trading's attempted assignment to Simon Levi. Because this Court concluded that ABOT is not entitled to summary judgment on plaintiff's tortious interference claim, it is necessary to consider whether there are genuine questions of material fact concerning a conspiracy among all the defendants to participate in the alleged interference.

In *Stubbs v. Taft*, 88 R.I. 462, 149 A.2d 706 (1959), the Rhode Island Supreme Court set forth the following guidelines for proving a civil conspiracy:

> In order to establish a conspiracy evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. *Stubbs*, 88 R.I. at 468, 149 A.2d at 708–09.

Here there are genuine issues of material fact concerning whether ABOT tortiously interfered. If, in fact, ABOT did tortiously interfere, there can be no dispute that if the other defendants cooperated in this venture then an "unlawful enterprise" was undertaken.

Defendants Hiram Walker, Inc. and Associated Importers contend, however, that any action ABOT took was purely unilateral. They contend that their only involvement in this matter was in getting Associated selected as the new importer.

Thompson Trading has presented sufficient evidence to raise genuine issues of material fact concerning the existence of a conspiracy among the three defendants. Thompson Trading points to a meeting of ABOT and Associated Importers officials held in the Netherlands in November of 1987 to discuss Associated Importers' acquisition of the rights to Double Diamond. In addition, Thompson Trading points to evidence that all three defendants were involved in Project Reagan. Plaintiff contends that this was ABOT's secret plan to install Associated Importers as the Double Diamond distributor in the United States.

■ Defendants allege that there can be no conspiracy claim because Thompson Trading knew about and encouraged the alleged conspiratorial acts. However, what and when plaintiff knew about the acts are in dispute. Furthermore, even if Thompson Trading knew of and encouraged certain acts, that would not defeat its conspiracy claim. Nothing in the Rhode Island law of conspiracy requires an agreement to do an unlawful act be secret. *See generally* 15A C.J.S. Conspiracy § 2 (1967) ("An unlawful combination is none the less unlawful because … it conducts its operations in a public or semipublic way.").

Finally, defendants cite the United States Supreme Court decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) for the proposition that there can be no conspiracy between a corporation and its wholly-owned subsidiary. This issue was discussed previously in this litigation. *See Thompson Trading Ltd. v. Allied Lyons PLC*, 124 F.R.D. 534 (1989). For the reasons stated in that opinion, *Copperweld* does not control the outcome here.

### Counterclaims

ABOT seeks summary judgment on three counterclaims (IV, V and VI) it has alleged against plaintiff Thompson Trading and counterclaim defendant William Thompson. First, it seeks summary judgment on counterclaim IV, its claim of conversion of three 1930's style promotional delivery vans against Thompson Trading. ABOT claims that it purchased the vans and allowed Thompson Trading to use them

for the term of the Agreement or until ABOT requested their return. Despite the termination of the Agreement and ABOT's requests for the return of the vans, Thompson Trading still maintains possession of the vehicles.

The situation is clouded because the vans were manufactured in England and needed to be converted to meet federal transportation and environmental standards. Although some conversion work was performed, the vans never fully met Department of Transportation (DOT) standards.

Thompson Trading contends that an authentic question exists as to which party bore ultimate responsibility of bringing the vans into Environmental Protection Agency (EPA) and DOT compliance. ABOT has attempted to dismiss this argument as irrelevant. As support ABOT argues that "the Customs fines at issue were *not* levied as a penalty for non-compliance with EPA and DOT regulations. Any such penalties would be the province of those two agencies." Documents sent to Thompson Trading by the Customs Service state that the Customs fines were imposed because it failed to redeliver the vans to Customs custody. Redelivery was requested, however, because the vans failed to comply with DOT safety requirements. The documents sent to Thompson Trading were forms entitled "Notice of Penalty or Liquidated Damages Incurred and Demand for Payment." The form cites 19 C.F.R. 141.-113 as the regulation violated, which states in part:

> If at any time after entry the district director finds that any merchandise contained in an importation is not entitled to admission into the commerce of the United States for any reason not enumerated in paragraph (a) of this section, he shall promptly demand the return to Customs custody of any such merchandise which has been released.

It is apparent that a violation of DOT regulations can become a concern of the Customs Service.

■ A genuine issue of material fact exists as to the issue of who had the responsibility of arranging for the conversion. ABOT contends that it was Thompson Trading's responsibility to arrange for the conversion of the vans to meet regulatory compliance. Thompson Trading states that although it assisted ABOT in the conversion, ABOT bore ultimate responsibility for the conversion.

Thompson Trading has offered to return the vans to ABOT if ABOT would pay mitigated damages to the Customs Service. ABOT refused because of the liability to pay it would assume. Thus, the disputed factual issue of which party bore the responsibility of conversion must be settled by a jury.

ABOT's two remaining motions for summary judgment concern Counterclaim V, breach of contract, and Counterclaim VI, breach of implied contract against William Thompson and Thompson Trading. Both claims arise out of a $75,000.00 promissory note executed by William Thompson on December 5, 1986.[5] ABOT requested that Thompson sign this note after ABOT paid a $85,000.00 settlement and at least $53,-000.00 in legal fees arising out of a suit brought by William Thompson's former employer against Thompson and ABOT.

ABOT's breach of contract counterclaim (Count V) seeks damages in the amount of the Note. In the alternative, the implied contract counterclaim (Count VI) seeks damages in the amount of legal fees actually paid by ABOT.

■ Under Rhode Island law, to prevail in a suit on a promissory note, it is necessary only to produce the note and produce evidence that the opposing party signed it. *Kuzoian v. Jaffa*, 52 R.I. 367, 161 A. 130 (1932); *Union Mortgage Co. v. Rocheleau*, 51 R.I. 345, 154 A. 658, 660 (1931). Here,

---

5. The Note states: "FOR VALUE RECEIVED, I promise to pay to Allied Breweries Overseas Trading Ltd. the sum of $75,000, without interest, on June 30, 1987." Below William Thompson's first signature the following language appears: "Terms and Method of Payment of the Above Amount to be agreed between the parties." The signatures of John Winther, Director of ABOT, and William Thompson appear just below that sentence.

there is no dispute as to the existence of the note, nor the validity of the signature of William Thompson which appears on the face of the note.[6]

■ Thompson's Memorandum in Opposition to ABOT's motion for summary judgment argues that genuine issues of material fact exist with respect to three defenses: fraud, coercion, and incompleteness. Thompson failed to affirmatively plead the defenses of fraud or coercion as explicitly required by Fed.R.Civ.P. 8(c). Furthermore, ABOT had no indication through discovery that such defenses would be litigated. Thompson's effort to inject these issues into this matter at such a late date, in contravention of Rule 8, falls short. The affirmative defenses of fraud and coercion to the promissory note are waived.[7]

■ Thompson argues that the Note is an incomplete expression of the parties' agreement because of the handwritten phrase on the bottom of the Note which states, "Terms and Method of Payment of the Above Amount to be agreed between the parties." Thompson seeks to introduce factual disputes by pointing to parol evidence that the parties to the Note knew Thompson could not possibly repay it before the stated due date. ABOT counters by citing *E.E. Rivet & Sons v. Durand*, 53 R.I. 48, 163 A. 476 (1932). There the Rhode Island Supreme Court held that "every clause of a written instrument should be considered and effect be given, if possible, to each." The *E.E. Rivet & Sons* rule is indeed applicable in this matter. The Note was due on the stated date of June 30, 1987, although the parties obviously planned to work out a schedule for repayment following that date. *See also Westerly Hosp. v. Higgins*, 106 R.I. 155, 160, 256 A.2d 506, 509 (1969) (noting the general rule that "ignorance of the contents of a writing is not a defense to an action thereon").

Because ABOT has done all that a party must do to succeed on a promissory note, it is entitled to summary judgment as to Count V of its Counterclaim against William Thompson. Judgment in the amount of $75,000.00 plus interest will be entered at a later time when all the issues in this litigation are resolved. Because ABOT argued for relief in the alternative, Count VI of its Counterclaim is hereby dismissed with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure.

Conclusion

To summarize, the motion of all defendants for summary judgment as to all remaining counts of the Second Amended Complaint is hereby denied. The motion of defendant ABOT for summary judgment as to Counterclaim IV is also denied. ABOT's motion for summary judgment against William Thompson as to Counterclaim V is granted. Counterclaim VI is dismissed with prejudice.

*It is so Ordered.*

---

6. In its Answer and Counterclaim, ABOT alleges that William Thompson is the "alter-ego" of Thompson Trading. Accordingly, ABOT's counterclaim allegations apply equally to both William Thompson and Thompson Trading. As grounds for this position, ABOT argues that recognition of Thompson Trading's corporate existence would result in injustice. The Rhode Island Supreme Court has held that "the standards for piercing the corporate veil vary with the circumstances." *Miller v. Dixon Indus. Corp.*, 513 A.2d 597, 604 (R.I.1986). A corporate entity's existence should be disregarded, and the principles treated as an association of persons when "the corporate entity is 'used to defeat public convenience, justify wrong, protect fraud, or defend crime.'" *R & B Elec. Co. v. Amco Constr. Co.*, 471 A.2d 1351, 1354 (R.I.1984) (quoting *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 139, 164 A. 509, 510–11 (1933)). The material presently before this Court fails to demonstrate the existence of such fraud or wrongdoing. *See Alterio v. Biltmore Constr. Corp.*, 119 R.I. 307, 315–16, 377 A.2d 237, 241 (1977). The counterclaim defendants therefore will be treated as separate entities.

7. On July 5, 1990, Thompson Trading and William Thompson filed a motion to amend their answer to the counterclaims of ABOT. The original answer to the counterclaim was filed on September 9, 1988. The proposed amended answer sought, among other things, to add the defenses of fraud and coercion. The motion was denied at a hearing held on September 12, 1990.