**HORD CORPORATION, Plaintiff,**

v.

**POLYMER RESEARCH CORPORATION OF AMERICA, Defendant.**

**No. 02–017L.**

United States District Court, D. Rhode Island.

Aug. 7, 2003.

Armando E. Batastini, Seth H. Handy, Edwards & Angell, Providence, RI, for Plaintiff.

Staci L. Kolb, Blish & Cavanaugh, Providence, RI, Emily H. Fournier, Howard Speicher, Davis, Malm & D'Agostine, P.C., Boston, MA, for Defendant.

### *DECISION AND ORDER*

LAGUEUX, Senior District Judge.

Plaintiff filed the present action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the implied warranty of fitness for a particular purpose, and unjust enrichment. Defendant counterclaimed, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Plaintiff subsequently moved for summary judgment pursuant to Fed.R.Civ.P. 56(c).

There are three issues currently before this Court. The first is whether the contract empowered plaintiff to demand a full refund of the contract price if plaintiff became dissatisfied with defendant's performance. The second issue is whether the implied covenant of good faith and fair dealing limited plaintiff's ability to terminate the contract. The third question is whether plaintiff was unjustly enriched. This writer will address these issues seriatim.

After close examination of existing case law, this Court concludes that plaintiff exercised its express option to terminate the contract in good faith and thus was not unjustly enriched. This Court, therefore, concludes that defendant breached the contract by refusing to refund the purchase price. Consequently, plaintiff's motion for summary judgment is granted.

## I. BACKGROUND

Hord Corporation, Inc. ("plaintiff" or "Hord") is a Rhode Island based jewelry distributor, specializing in the sale of raw materials and unfinished pieces to jewelry manufacturers and retailers. Polymer Research Corporation of America ("defendant" or "Polymer") is a New York based corporation which formulates, among other things, chemical grafting processes. (Pl.'s Mem. Supp. Summ. J. at 2.)

Hord's Vice President, Mark Pouliot ("Pouliot"), contacted Polymer in January 2001 to explore the possibility of creating a process that would add color to clear rhinestones. (E-mail from Pouliot to defendant (Jan. 9, 2001).) A rhinestone is cut faceted glass which is designed to imitate a precious gemstone. All colored rhinestones in the United States are cut from colored glass. Plaintiff must stock over twenty-five colors of each size rhinestone that it markets, necessitating a yearly overhead of approximately three million dollars. Although there is no process presently available for applying color to clear rhinestones, such a process would be of great commercial value, because plaintiff would (1) be able to dispense with the need for $3 million in overhead by maintaining only clear rhinestones in stock, (2) gain an edge in the domestic market by producing rhinestones of the same quality at a far lower price, and (3) be able to license its colorization process to other manufacturers. (Pouliot Aff. ¶¶ 1–5; e-mail from Pouliot to defendant (Jan. 9, 2001).)

Pouliot visited Polymer's headquarters in New York on January 15, 2001, and met with Polymer's Vice President of Sales, John Ryan ("Ryan"). (Pouliot Aff. ¶ 6.) Ryan informed Pouliot that defendant had the capacity to develop a process that could individually colorize rhinestones. Ryan emphasized that these rhinestones would be indistinguishable from those currently marketed by plaintiff. (*Id.*) The stones would also be scratch and heat resistant. Ryan informed Pouliot that it would take defendant approximately one to two months to develop a suitable process. (*Id.*)

Despite Ryan's optimism, plaintiff was concerned that this speculative and innovative process might never come to fruition. (*Id.* at ¶ 7; e-mail from Pouliot to defendant (Sept. 27, 2001); e-mail from Pouliot to Ryan (Nov. 19, 2001).) For that reason, plaintiff was leery of making a large upfront payment to Polymer. (Pouliot Aff. ¶ 7.) Ryan sought to overcome Hord's hesitation by offering to provide a money back guarantee in order to assure plaintiff that defendant could meet Hord's expectations.[1] (*Id.* at ¶ 7; e-mail from Ryan to Pouliot (May 8, 2001).) As a result, plaintiff would be free to terminate the contract with defendant if plaintiff became dissatisfied with the coloring process in any way.[2] (E-mail from Ryan to Pouliot (May 9, 2001).)

---

**1.** The content of Ryan's May 8, 2001 e-mail to Pouliot reads: "If I may say, this is not a promise that you have from [Polymer], but a MONEY BACK GUARANTEE!" (E-mail from Ryan to Pouliot (May 8, 2001) (*quoted in* Ryan Dep. at 25–26) (capitals in original).)

**2.** The text of Ryan's May 9, 2001 e-mail to Pouliot reads: "I assure you [Polymer] will not see a profit from this project until HORD begins to order formulations from [Polymer] upon HORD's satisfaction with the program." (E-mail from Ryan to Pouliot (May 9, 2001)

The parties thereafter entered into a Product Development Agreement ("Agreement") on June 20, 2001.[3] The termination and refund provision, negotiated and agreed upon by both parties, reads as follows:

In the event the Products prove unsuitable for Hord's use, at Hord's sole discretion, in that they are not readily interchangeable with colored crystal products now being sold by Hord in the same marketplace and to the same customers, any and all amounts paid to [Polymer] will be refunded to Hord within ten (10) days from receipt of such notice.

(Agreement ¶ 2.) In accordance with the Agreement, plaintiff tendered Polymer a $135,000 fee. Defendant, thereafter, began to provide plaintiff with sample rhinestones based on plaintiff's specifications. (*Id.* at ¶ 1(a).) In a letter dated June 20, 2001, the same day the parties signed the Agreement, plaintiff articulated that the rhinestones must mimic color samples provided by plaintiff, and be scratch and heat resistant.[4] (Letter from Pouliot to Ryan of 6/20/01.) In that same letter, plaintiff also stipulated that defendant employ a dip process, rather than a spray process. (*Id.*) Later, in September, 2001, plaintiff required that defendant provide samples of smaller rhinestones, rather than the larger ones which Hord had previously requested. (Thottathil Dep. at 35–6.)

The history of Phase One is marked by defendant's recurring inability to develop a satisfactory coloring process.[5] Plaintiff received defendant's first set of samples on July 25, 2001, approximately one month after signing the Agreement. (Pouliot Aff. ¶ 14.) Five days later, Pouliot sent an e-mail to Ryan in which he expressed plaintiff's displeasure with the first set of stones. (E-mail from Pouliot to Ryan (July 30, 2001).) Pouliot wrote, "Our goal is to imitate the colored stones exactly. . . . Is this still an attainable goal?" (*Id.*) On September 26, 2001, plaintiff received the second batch of samples, roughly two months to the day after the arrival of the first set. (Pouliot Aff. ¶ 16.) These too proved inadequate, which Pouliot made clear to defendant in an e-mail dated September 27, 2001. (E-mail from Pouliot to defendant (Sept. 27, 2001).) Pouliot once again provided defendant with a detailed list of the specific inconsistencies and defects. (*Id.*) Commenting on the September 26, 2001 samples in a letter dated October 17, 2001, Pouliot stated that "we feel strongly that you will not be able to formulate the [rhinestones] to the exact

*(quoted in* Ryan Dep. at 24) (capitals in original).)

3. The Product Development Agreement ("Agreement") provided for two phases: (1) the research and development of a colorization formula by defendant; and (2) the formula transfer to plaintiff, should defendant successfully develop the colorization process. Phase One commenced when plaintiff paid defendant a $135,000 fee. Defendant would supply plaintiff with samples as it developed the colorization process. If plaintiff indicated satisfaction with the samples, defendant would transfer the colorization formula to Hord, so that Hord could color the rhinestones itself and license the process to other manufacturers. If plaintiff was not satisfied with the samples, plaintiff could terminate the contract and defendant would refund the $135,000 fee. The Agreement specified that Phase One would end when plaintiff indicated in writing to defendant that plaintiff was satisfied with the results. (Agreement ¶¶ 1–2.)

4. Plaintiff contends that Hord specified more requirements, and that defendant failed to achieve those as well. Given that plaintiff's and defendant's scientists agree that defendant never achieved the three primary goals at the time plaintiff terminated the Agreement, this Court need not consider whether defendant fulfilled any additional requirements.

5. This writer need not discuss Phase Two in greater detail, because this suit only involves Phase One.

specifications described by Mr. John Ryan" and that the rhinestones may not be "commercially accepted and cost effective." (Letter from Pouliot to Ryan of 10/17/01.) Nevertheless, still hoping for a viable coloring process, plaintiff awaited defendant's third set of samples. Defendant's third and final batch arrived in November, 2001. (Pouliot Aff. ¶ 18.) Once again, the samples failed to meet plaintiff's expectations. Pouliot expressed plaintiff's disappointment in an e-mail dated November 19, 2001, which was sent 153 days after plaintiff submitted the up-front payment of $135,000 on June 20, 2001. (Pouliot Aff. ¶¶ 19–20; e-mail from Pouliot to defendant (Nov. 19, 2001).) Pouliot wrote in part, "based on the failure of this project, and your signed guarantee, we exercise our option [to terminate the Agreement] and want a complete and total refund of the $135,000." (*Id.*) Plaintiff demanded that defendant provide the full refund on three separate occasions. (Pouliot Aff. ¶¶ 20, 21, 23.) Defendant answered plaintiff's demands only by asking for more time during which to complete the project. (*Id.* at ¶ 22.)

Thereafter, plaintiff filed the present action in this Court. On December 30, 2002, plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). Defendant objected to the motion and a hearing was scheduled on the matter. On March 20, 2003, this Court held a hearing on the motion for summary judgment. At the conclusion of the hearing, the Court took the matter under advisement. The parties have briefed the issues and the matter is now in order for decision.

## II. DISCUSSION

### A. Standard for Summary Judgment and Jurisdiction

Plaintiff brought this action pursuant to this Court's diversity jurisdiction. 28 U.S.C. § 1332 (2003). This Court, there-fore, will look to the law of Rhode Island in order to resolve plaintiff's state law claims.

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Kearney v. Town of Wareham*, 316 F.3d 18, 21 (1st Cir.2002). Rule 56(c) of the Federal Rules of Civil Procedure provides the standard for ruling on summary judgment motions:

> The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court must view all inferences in the light most favorable to the non-moving party. *Kearney*, 316 F.3d at 22. Nevertheless, the United States Supreme Court has noted that, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (italics in original). A genuine issue is one supported by such evidence that a reasonable jury could resolve that issue in favor of the nonmoving party. *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir.2003). Furthermore, a disputed fact is considered material when that fact has the potential to "affect the outcome of the suit under the governing law." *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues

of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet this burden by demonstrating an absence of evidence to support the non-moving party's case. *Rochester Ford Sales, Inc. v. Ford Motor Co.,* 287 F.3d 32, 38 (1st Cir.2002) (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). Once the moving party satisfies that burden, the nonmoving party must demonstrate that a reasonable jury could find in its favor with respect to each issue on which that party has the burden of proof at trial. *Id.* (citing *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548). For each issue, the nonmoving party "must present definite, competent evidence to rebut the motion." *One Parcel,* 960 F.2d at 204. Failure to satisfy that burden compels the Court to enter summary judgment on the moving party's behalf.[6] *Id.*

**B. The Express Option to Terminate**

▇ Plaintiff contends that it acted within permissible contractual bounds when it terminated the Agreement. Accordingly, plaintiff alleges that it is entitled to a full refund of the $135,000 it paid defendant at the inception of Phase One. Plaintiff points to the express language of the Agreement, specifically the termination and refund provision, in support of its contention. (Agreement ¶ 2.) Plaintiff emphasized at the summary judgment hearing that defendant is a publicly traded, sophisticated corporation, and thus was fully aware of the express language of the Agreement before signing it. Defendant does not deny that the inclusion of the termination and refund provision was a concession it made in order to overcome plaintiff's reluctance to enter into a contract to develop a new and speculative

coloring process. (E-mail from Ryan to Pouliot (May 9, 2001); e-mail from Ryan to Pouliot (May 8, 2001).)

▇ The issue before this Court, therefore, is whether the express language of the Agreement enables plaintiff to determine for itself whether its expectations have been met. In order to resolve this issue, this writer must first examine the language of the contract. The interpretation of contract language is a matter of law to be decided by the Court. *See Newport Plaza Assocs. v. Durfee Attleboro Bank,* 985 F.2d 640, 644–45 (1st Cir.1993). This Court has explained that when a contract is clear and unambiguous, the task of judicial construction is at an end, and the Court will enforce the contract as written. *Kelly v. Tillotson–Pearson, Inc.,* 840 F.Supp. 935, 944 (D.R.I.1994) (citing *Aetna Cas. & Sur. Co. v. Graziano,* 587 A.2d 916, 917 (R.I.1991)). The Court gives the language in the contract its "plain, ordinary and usual meaning." *Amica Mutual Ins. Co. v. Streicker,* 583 A.2d 550, 552 (R.I. 1990). A contract is ambiguous, however, if it is "reasonably susceptible of different constructions." *Vickers Antone v. Vickers,* 610 A.2d 120, 123 (R.I.1992).

No contractual ambiguity exists in the present case. This Court ascertains only one clear meaning in the Agreement's language: that defendant is bound to refund Hord's fee of $135,000 should plaintiff exercise its option to terminate the contract. The Agreement allows plaintiff—in its sole discretion—to exercise that option if the newly-colored rhinestones are not readily interchangeable with plaintiff's existing stock. (Agreement ¶ 2.)

---

**6.** Although plaintiff's memorandum of law in support of its motion for summary judgment walks this Court through the summary judgment procedure of Rhode Island, the Federal Rules of Civil Procedure govern the present

case. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Crellin Techs., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 4 (1st Cir.1994).

## C. The Implied Covenant of Good Faith and Fair Dealing

Since this writer has determined that the contract language is clear and unambiguous, this Court must now determine whether the implied covenant of good faith and fair dealing has nevertheless been breached.[7]

 In their respective memoranda supporting and opposing the present motion, the parties rely on competing standards for satisfaction clauses in order to support their contentions that the covenant of good faith and fair dealing has, or has not, been breached.[8] Plaintiff asserts that this Court ought to apply the subjective honesty-in-fact standard in order to determine whether it breached the covenant, because the express option to terminate in the present case provides that plaintiff may demand a full refund at its sole discretion.[9] (Pl.'s Mem. Supp. Summ. J. at 9–10.) Defendant contends, however, that plaintiff's actions should be held to the objective reasonableness standard. (Def.'s Mem. Opp'n Summ. J. at 11–12.) In the alternative, defendant argues that the honesty-in-fact standard precludes summary judgment, because a party's motivation is a question for the trier of fact.[10] (Id.)

The parties' arguments, however, miss the point. The issue before the Court is not whether the newly-colored rhinestones were satisfactory, but whether plaintiff could demand a refund anytime it deemed the rhinestones unsatisfactory. In the present case, no reasonable fact finder could conclude that the rhinestones were satisfactory. Plaintiff provides ample evidence to show that the rhinestones were not interchangeable with the rhinestones in plaintiff's stockpile. (Pouliot Aff. ¶¶ 14–23, Tabs 5–8.) Most significantly, defendant's own Director of Research and

---

7. Plaintiff incorrectly contends in its Reply Memorandum that defendant waived its implied covenant of good faith and fair dealing claim, because defendant never pled that claim as an affirmative defense. (Pl.'s Reply Mem. Supp. Summ. J. at 1.) Defendant, however, properly pled the covenant as a counterclaim in its Answer. (Def.'s Am. Answer & Countercl. at 7–8); See e.g. Schofield v. French, 36 F.Supp.2d 481, 484 (D.R.I.1999). Yet, even if defendant had mistakenly designated the covenant in its pleading, courts are wary to exercise outright dismissal of the claim, because of the broad language of Fed. R.Civ.P. 8(c). See Reiter v. Cooper, 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

8. A satisfaction clause is express language in a contract that promises to render a performance satisfactory to the other party. 13 Williston on Contracts § 38:21 (4th ed.). In the present case, the language of the termination and refund provision constitutes a satisfaction clause, because plaintiff must be satisfied with defendant's samples in order for defendant to complete Phase One successfully. (Agreement ¶ 2.)

9. As substantive support for this proposition, plaintiff cites cases outside of Rhode Island: Kohler v. Leslie Hindman, Inc., 80 F.3d 1181, 1187 (7th Cir.1996) (holding that sole discretion denotes subjectivity and the court need only find honesty-in-fact); Mickle v. Christie's, Inc., 207 F.Supp.2d 237, 249–52 (S.D.N.Y. 2002) (holding that actions requiring sole judgment are uniformly upheld subject only to honesty-in-fact); In Re Sizzler Rest. Int'l, Inc., 225 B.R. 466, 473–75 (Bkrtcy.C.D.Cal.1998)(holding that implied covenant of good faith and fair dealing cannot override an express provision in a contract under California, Kentucky, Ohio, and Indiana law). (Pl.'s Mem. Supp. Summ. J. at 9–11.)

10. Defendant's substantive support includes: Gorman v. St. Raphael's Academy, 2002 WL 31455570 at *12–*16 (R.I.Super.) (finding a covenant of good faith in the contractual relationship between a school and student); Greenwood v. Koven, 880 F.Supp. 186, 198–200 (S.D.N.Y.1995) (holding that the subjective standard for satisfaction clauses are subject to the covenant of good faith and that the issue of motive is a question of fact). (Def.'s Mem. Opp'n Summ. J. at 10–13.)

Development, Dr. Mohan Sanduja ("Sanduja"), conceded at his deposition that defendant had not successfully met all the goals of the project at the time plaintiff terminated the Agreement. (Sanduja Dep. at 105–106.) The newly colored rhinestones, therefore, are unsatisfactory regardless of whether this Court applies the "honesty-in-fact" or "reasonableness" standard to the Agreement's satisfaction clause. Consequently, the only question is whether the covenant of good faith and fair dealing limited the exercise of plaintiff's express option to terminate the Agreement.

 It is well established in Rhode Island that, "virtually every contract contains an implied covenant of good faith and fair dealing between parties." *Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I.2002) (quoting *Crellin*, 18 F.3d at 10). Claims for breach of the covenant of good faith sound in contract, not in tort. *A.A.A. Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co.*, 121 R.I. 96, 395 A.2d 724, 725–26 (1978). While every breach of the covenant of good faith and fair dealing implicates a breach of contract, not every breach of contract necessarily involves a breach of the covenant. *Ross–Simons of Warwick, Inc. v. Baccarat*, 66 F.Supp.2d 317, 330 (D.R.I.1999). Rhode Island has adopted the covenant in order to ensure that contractual objectives are achieved. *Fleet Nat'l Bank v. Liuzzo*, 766 F.Supp. 61, 67 (D.R.I.1991) (quoting *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 297 A.2d 643, 645 (1972)). The covenant of good faith is regarded as a counterpromise that the promisee will act in a manner consistent with the purposes of the contract. *Ross–Simons*, 66 F.Supp.2d at 330.

In *Ide Farm*, the Rhode Island Supreme Court looked to the objectives behind the contract, which involved the conveyance of a farm. 297 A.2d at 644–45. When the defendant failed to purchase the parcel, the plaintiff sued for breach of the covenant of good faith and fair dealing. *Id.* at 643. The defendant successfully argued, however, that the conveyance was conditioned upon his ability to obtain a mortgage. *Id.* at 644–45. Indeed, the Court emphasized that the defendant would not have entered into the agreement but for this escape hatch. *See Id.* at 645. The Court noted that obtaining a mortgage in a "tight money market" can be a speculative process at best. *Id.* at 645. Consequently, the Court held that the defendant was not in violation of the covenant of good faith and fair dealing. *Id.*

The Rhode Island Supreme Court's reasoning in *Ide Farm* is directly applicable to the case at bar. In the present case, the contract's unambiguous language demonstrates that the parties contemplated that the coloring process might be unsuccessful. The parties inserted the termination and refund provision to deal with such a situation. (Pouliot Aff. ¶ 7; e-mail from Ryan to Pouliot (May 9, 2001); e-mail from Ryan to Pouliot (May 8, 2001).) Indeed, Ryan insisted during contract negotiations that defendant could produce rhinestones that were indistinguishable from plaintiff's current stock. (Pouliot Aff. ¶ 6.) To that end, Ryan promised that defendant would not see a profit until plaintiff was entirely satisfied with the formulations. (E-mail from Ryan to Pouliot (May 9, 2001).) Moreover, Ryan commented that Polymer would do more than merely promise to perform satisfactorily: it would provide a money back guarantee to overcome plaintiff's reservations about the success of the project. (E-mail from Ryan to Pouliot (May 8, 2001); Pouliot Aff. ¶ 6.) Thus, the parties negotiated for an Agreement which included a termination and refund provision. (Agreement ¶ 2.) It was the inclusion of this clause that alleviated Hord's concerns about embarking on a

highly speculative, though potentially profitable, venture. (Pouliot Aff. ¶¶ 11, 20; e-mail from Pouliot to defendant (Nov. 19, 2001).)

It is evident to the Court that the provision was a suitable protective measure in a contract of potentially limitless duration. Plaintiff, of course, realized that defendant might be unsuccessful in its initial attempts. (*See* e-mail from Pouliot to Ryan (July 30, 2001).) In fact, plaintiff even granted defendant more time than defendant originally presumed the project would take to complete. (E-mail from Pouliot to defendant (Nov. 19, 2001).) Nevertheless, defendant still requested additional time, while simultaneously asserting that the project was nearing completion. (Pouliot Aff. ¶ 22; Sanduja Dep. at 124.) Sanduja conceded, however, that it could take up to six additional months to develop a suitable formula. (Sanduja Dep. at 124.) Yet, defendant still could not guarantee that it would successfully develop a formula process even within that six month time frame. (*Id.* at 124–25.) Plaintiff was wise, therefore, to accept defendant's offer to include the termination and refund provision so as to ensure that defendant would not indefinitely tie up plaintiff's capital.

The case law, however, in no way suggests that a party can circumvent the covenant of good faith and fair dealing through the inclusion of an express option to terminate. *See Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1153–54 (D.C.Cir.1984) (warning that "to say that every expressly conferred contractual power is of this nature is virtually to read the doctrine of good faith ... out of existence"). The contractual objectives evinced from an option to terminate form the permissible bounds of the good faith requirement for a given contract. *Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd.,* 748 F.Supp. 936, 942–43 (D.R.I.1990); *Ide Farm,* 297 A.2d at 644–45. This Court has

emphasized that a party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith. *Thompson,* 748 F.Supp. at 942–43. A party's actions, however, do not violate the covenant of good faith and fair dealing when they were contemplated by the parties at the time of contract formation. *Psaty & Fuhrman, Inc. v. Hous. Auth. of City of Providence,* 76 R.I. 87, 68 A.2d 32, 35 (1949).

It is clear to this Court that plaintiff clearly acted within the parties' contractual objectives when it exercised its express option to terminate the Agreement. The purpose of the covenant of good faith and fair dealing is to protect the parties' objectives and reasons for entering into a contract. *Thompson,* 748 F.Supp. at 942–43; *Ide Farm,* 297 A.2d at 644–45. Since plaintiff would not have entered into the contract but for the termination and refund provision, this Court refuses to utilize the covenant to undermine the very reason plaintiff agreed to pay defendant $135,000 in the first place. *Ide Farm,* 297 A.2d at 644–45. An unambiguous contractual clause, agreed upon by both parties, cannot be rendered meaningless, because one party does not like its strict application. *Psaty,* 68 A.2d at 36. Since plaintiff acted within the confines of the parties' contractual objectives, and thus by definition in good faith, plaintiff did not violate the implied covenant of good faith and fair dealing. *Ide Farm,* 297 A.2d at 644–45. Defendant's refusal, therefore, to refund plaintiff the $135,000 fee constitutes a breach of contract.

### D. Unjust Enrichment

Lastly, defendant contends that plaintiff was unjustly enriched through (1) defendant's labor, research, development, and costs throughout the five months that constituted Phase One of the project, and

because (2) plaintiff was capable of using Polymer's samples in the marketplace. (Def.'s Mem. Opp'n Summ. J. at 13–15.)

 In Rhode Island, the doctrine of unjust enrichment is applicable when, "it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another." *Merchants Mut. Ins. Co. v. Newport Hosp.*, 108 R.I. 86, 272 A.2d 329, 332 (1971). In order for a party to recover under a theory of unjust enrichment, that party must prove that (1) a benefit has been conferred upon the other party, (2) that party appreciated the benefit, and (3) that party accepted the benefit in a manner in which it would be inequitable to retain that benefit without paying for it. *Rhode Island Bhd. of Corr. Officers v. Rhode Island*, 264 F.Supp.2d 87, 104–05 (D.R.I.2003) (citing *Bouchard v. Price*, 694 A.2d 670, 673 (R.I.1997)).

Defendant's contentions that its expenditures of labor and resources in the project unjustly enriched plaintiff are without merit. First, defendant did not confer a benefit on plaintiff, because none of the samples were interchangeable with plaintiff's existing stock of rhinestones. Pouliot informed defendant of the unsuitability of the rhinestones on numerous occasions, and Sanduja conceded as much in his deposition. (Pouliot Aff. ¶¶ 14–23, Tabs 5–8; Sanduja Dep. at 105–106.) Consequently, plaintiff could neither appreciate nor ine-

quitably accept any benefit because none ever materialized.

Defendant also avers that the samples it provided to plaintiff were capable of being sold in the wake of September 11th, because the heightened demand made lower quality rhinestones acceptable. (Def.'s Mem. Opp'n Summ. J. at 14–15.) In support of this contention, defendant cites an e-mail, dated September 27, 2001, in which Pouliot appears to concede that inferior rhinestones might be marketable in a patriotic emblem during the short term.[11] (E-mail from Pouliot to defendant (Sept. 27, 2001).) Yet, the remainder of the e-mail shows Pouliot's comment to be nothing more than an impractical option that plaintiff was unwilling to execute. (*Id.*) Pouliot noted that marketing unsuitable rhinestones would be impossible without price concessions, which was not a viable option as far as plaintiff was concerned.[12] (*Id.*) Pouliot concluded by insisting that defendant perfect the colorization process. (*Id.*) Therefore, despite a lower bar of acceptability in the short term, defendant's samples conferred no benefit on plaintiff, because plaintiff was unwilling to market them. (*Id.*) Consequently, plaintiff neither appreciated nor inequitably retained any benefit from the samples, and was thus not unjustly enriched.

### III. CONCLUSION

For the aforementioned reasons, plaintiff's motion for summary judgment is

---

**11.** Pouliot stated:

Although the color shades are not exactly to the color chart supplied, it may be acceptable to offer in a patriotic emblem, as demand is causing lesser quality to be acceptable in these items. However, lesser quality is not the mark of the Hord Crystal Corporation, and will not be acceptable in the long term.

(E-mail from Pouliot to defendant (Sept. 27, 2001).)

**12.** Pouliot elaborated:

[C]ustomers would look at the stones with a jaundiced eye and would probably take a long time to accept their quality without giving price concessions. Given the demand placed on us presently, now is the perfect time to present this alternative stone without the need of price concessions. Hord needs the process to be completed now and a concentrated effort by [Polymer] personnel should be initiated to bring the project to a successful conclusion. (*Id.*)

granted and plaintiff is entitled to recover for breach of contract pursuant to Count I of the Complaint. Therefore, Counts II, III and IV are superfluous and thus dismissed sua sponte by the Court.

Judgment shall enter for plaintiff against defendant on Count I of the Complaint for $135,000 plus prejudgment interest calculated at 12% per annum from Nov. 29, 2001 (date of termination Nov. 19, 2001 plus 10 days) to the date of judgment. Judgment shall also enter for plaintiff on defendant's counterclaims. It is so ordered.