DECISION
Before this Court is a Super. R. Civ. P. 56 motion for summary judgment brought by Plaintiff Ferris Avenue Realty, LLC (Ferris Avenue) against Defendant Huhtamaki, Inc. as corporate successor to Huhtamaki Foodservice, Inc. and Huhtamaki-East Providence, Inc. (Huhtamaki). Ferris Avenue seeks summary judgment as to liability on Count II of its First Amended Complaint for breach of the indemnity agreement and on all five counts of Defendant's First Amended Counterclaims. Huhtamaki has asserted counterclaims for (1) fraudulent inducement; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing.
 I Facts and Travel
Ferris Avenue is a Rhode Island limited liability company engaged in the business of real estate ownership, management, and development. Huhtamaki Foodservice, Inc. was a Delaware corporation authorized to do business in the State of Rhode Island and engaged in the sale of paper products. See Stringer Dep. Tr. 25:1-27:13, May 19, 2010. Huhtamaki-East *Page 2 
Providence, Inc. was a Rhode Island corporation engaged in the manufacturing of paper products and the owner of real estate located at 275 Ferris Avenue, East Providence, Rhode Island (Property). Id. By January 2010, both Huhtamaki Foodservice, Inc. and Huhtamaki-East Providence, Inc. had been merged into Huhtamaki, Inc., a Kansas corporation with its principal place of business in DeSoto, Kansas and authorized to do business in the State of Rhode Island. Id.
The Property consists of approximately 22.21 acres, portions of which had either been used as a disposal area or had been contaminated by "residual No. 6 fuel oil."[1] See Stringer Dep. Ex. 11 § 2.0; Def.'s Opp'n Mem. Ex. B ¶ 5. The Property has been "improved with a 320,000 square-foot manufacturing building, a paint shop, a hazardous materials storage shed, a carpenter's shop, several additional small outbuildings, a water tower (for fire suppression), and associated paved parking areas."See Stringer Dep. Ex. 11 § 2.0. Additionally, approximately five acres at the northeast end of the Property were undeveloped and vegetated. Id.
In or about 2003, the Property was listed for sale with two commercial real estate brokers, Hart Corporation and NAI/MG Commercial Real Estate (collectively, Brokers). See Stringer Dep. Tr. 34:2-25, May 19, 2010. On March 3, 2003, Granoff Associates, LLC (Granoff), Ferris Avenue's managing member, sent the Brokers a written offer to purchase the Property through its own broker, CB Richard Ellis. See Ferris Avenue Dep. Tr. 3:18-25, Sept. 30, 2010; Stringer Dep. Tr. 41:13-16, May 19, 2010; Stringer. Dep. Ex. 8. Granoff offered *Page 3 
$3,400,000 to purchase the Property, but required a Representations and Warranties Agreement and an Indemnity Agreement Regarding Hazardous Materials (Indemnity Agreement) (collectively, Subject Agreements) for its benefit and as partial consideration for the purchase price. See Stringer Dep. Tr. 45:6-23, May 19, 2010; Stringer Dep. Ex. 8. Huhtamaki accepted and signed Granoff's offer on March 6, 2003. See Stringer Dep. Tr. 46:1-5, May 19, 2010.
Although a purchase and sale agreement was not drafted, Ferris Avenue and Huhtamaki "heavily" negotiated the Indemnity Agreement before executing it at the time of the Closing.[2] See
Stringer Dep. Tr. 71:13-23, 79:4-8, May 19, 2010. The Indemnity Agreement covered all 22.21 acres purchased by Ferris Avenue and its provisions survived the sale of the Property. See Def.'s Opp'n Mem. Ex. D. Under its terms, Huhtamaki covenanted and agreed to "indemnify, protect and hold harmless [Plaintiff] from and against any and all Damages (including without limitation reimbursement of clean-up costs)" directly or indirectly arising out of the presence or release of various hazardous substances existing on the Property on or prior to the Closing.[3] Id. § 2.
The Indemnity Agreement also provided separate procedures by which the parties could assert and resolve indemnification claims.See id. § 6. Where a third party asserted a claim against it, Ferris Avenue was required to give Huhtamaki notice (Claim Notice) "with reasonable *Page 4 
promptness" and to cite the "nature of and specific basis for [the] claim" and "the amount or estimated amount thereof to the extent then feasible." Id. § 6(a). Huhtamaki was thereafter required to respond within 10 days from delivery or mailing of the Claim Notice (Notice Period) and notify Ferris Avenue of (1) whether it disputed liability, or (2) whether it [would] defend Ferris Avenue against the claim or demand. Id.
In those instances in which Ferris Avenue possessed claims against Huhtamaki that were unrelated to a claim or demand from a third party, Ferris Avenue was simply required to "send a Claim Notice with respect to such claim to the Indemnitor."Id. § 6(c). Any disputes of the claim by Huhtamaki were to be resolved by litigation. Id.
In addition to its indemnification obligations, under the Indemnity Agreement, Huhtamaki generally agreed to "retain responsibility for any investigation or remediation measures required by the Rhode Island Department of Environmental Management ["RIDEM"] and/or the U.S. Environmental Protection Agency that exist[ed] at the time of the Closing." See Def.'s Opp'n Mem. Ex. D § 3. Huhtamaki retained responsibility for, among other things, "finaliz[ing] the Environmental Land Use Restriction agreement." Id. These obligations extended only to the soil and groundwater conditions existing at the time of the Closing, and were satisfied "upon the issuance by the applicable authority of a `certificate of completion' . . . confirming the work required by such authority ha[d] been completed and that no further work was required." Id.
In accordance with section 3, Huhtamaki prepared and the parties negotiated an Environmental Land Usage Restriction (ELUR) based on a template provided to them by RIDEM. See Steeves Dep. Tr. 22:1-3, Mar. 31, 2009; Stringer Dep. Tr. 38:8-10, May 19, 2010. Robert Steeves (Steeves), Huhtamaki's corporate environmental manager, was responsible for its *Page 5 
preparation and submission, and Rochelle Stringer (Stringer), Huhtamaki's general counsel, also reviewed and approved the language. See Steeves Dep. Tr. 21:19-22:3, Mar. 31, 2009; Stringer Dep. Tr. 38:4-39:23, May 19, 2010. Although at the time of the Closing, an ELUR had not been finalized, one had been submitted to RIDEM in connection with Huhtamaki's April 29, 2003 Site Investigation Report (SIR).See Stringer Dep. Tr. 73:20-23, May 19, 2010; Stringer Dep. Ex. 11. This ELUR (Proposed ELUR) only prohibited residential use on a small portion (Affected Parcel) of the Property that was "determined to contain soil . . . contaminated with residual #6 fuel oil in excess of applicable leachability criteria." Id.
On or about April 30, 2003, Ferris Avenue's environmental consultant, Pamela McCarthy (McCarthy), emailed Steeves to question whether the Proposed ELUR would apply to the "area around the loading dock or for the entire site," as she "was not aware of any other environmental issues that need[ed] to be addressed."See Steeves Dep. Ex. 10. McCarthy stated that her inquiry was the result of a conversation with a RIDEM representative, Jeff Crawford (Crawford), who indicated that "the ELUR would have to be placed on the entire lot since a Site Investigation Report [had] not completed for the entire site." Id.
Several days later, Steeves emailed Stringer to update her on his telephone conversation with McCarthy and to discuss whether Huhtamaki should complete a SIR for the entire Property.See Steeves Dep. Tr. 44:2-24, Mar. 31, 2009; Steeves Dep. Ex. 11. In part, Steeves wrote:
 "[Pam's] understanding from Jeff Crawford @ [sic] RIDEM is that the ELUR must address the entire site, not just the residual oil — impacted area we proposed. The reason — we had never submitted a site-wide [SIR]. Before I call Jeff to see whether her information is correct, we need to decide whether to offer to produce such a report. . . . Pam stated that she planned to advise the buyer that it made no difference to her whether [the ELUR covered a] small area or the whole site. It would be a lot cheaper to broaden the ELUR than to compile a site-wide report, and if it makes no *Page 6 
difference to the buyer, I can't see why we'd spend the money." See Steeves Dep. Ex. 11 (emphasis added).
On May 14, 2003, McCarthy emailed Brian Gill, a Granoff employee, and John Garrahy, Granoff's counsel, explaining that while the ELUR in its current form "was written in such a way that the restriction was only placed on the UST/loading dock area," it was unacceptable to Crawford, and "a revised ELUR [would] probably be required by Huhtamaki."[4] See Ferris Dep. Ex. Z. Although the ELUR had not been finalized, on May 22, 2003, the Property was sold to Ferris Avenue and the Indemnity Agreement was executed by the parties.[5]
The deed (Deed) conveying the Property to Ferris Avenue contained no language limiting the use of the Property or restrictions against subdivision or zoning changes. See
Stringer Dep. Tr. 76:4-22, 133:24-134:7, May 19, 2010; Stringer Dep. Ex. 15.
On August 6, 2003, Steeves informed Stringer by email that RIDEM had "agreed to go with the soil management deed restriction on the `[A]ffected [P]arcel' only, but want [sic] an overall restriction on the entire [P]roperty for `no use of groundwater for potable' and `no use of the [P]roperty for residential development.'"See Steeves Dep. Tr. 71:23-72:25, Mar. 31, 2009; Steeves Dep. Ex. 24. Despite RIDEM's expansion of the Proposed ELUR, on or about August 20, 2003, Stringer forwarded to Garrahy the unmodified Proposed ELUR still containing a residential use restriction on only the Affected Parcel. See Stringer Dep. Tr. 88:3-93:5, May 19, 2010; Stringer Dep. Exs. 18-20. Garrahy subsequently accepted the Proposed ELUR. Id. *Page 7 
Nevertheless, on or about September 3, 2003, Huhtamaki prepared an ELUR with the residential use restriction applicable to the entire Property (Revised ELUR). See Stringer Dep. Tr. 93:16-95:10, May 19, 2010. On December 19, 2003, Garrahy spoke with McCarthy and told her that "even though VHB informed him that Jeff Crawford wouldn't accept the ELUR in its current form (i.e. only a portion of the [Property] is under the ELUR) he [would] tell Rochelle Stringer that he [was] ok with it in its current format [and] that she [could] submit it." See McCarthy Dep. Ex. T. Garrahy further stated that "if [the ELUR was] rejected by RIDEM, it [would] be on Huhtamaki to complete the SIR if that is what is requested by RIDEM." Id.
Although a copy of the Revised ELUR had not been sent to or approved by Ferris Avenue, its counsel, or any of its representatives, on December 24, 2003, Steeves sent a red-lined version of the Revised ELUR to RIDEM incorporating RIDEM's requested expansion of the residential use restriction. See McCarthy Dep. Tr. 42:8-18, Jan. 6, 2009; Stringer Dep. Tr. 95:11-97:18, May 19, 2010; Stringer Dep. Ex. 22. Similarly, on January 26, 2004, Steeves sent the Revised ELUR to RIDEM with certain related attachments without copying Ferris Avenue, its counsel, or any of its representatives. See Stringer Dep. Tr. 97:23-99:9, May 19, 2010; Stringer Dep. Ex. 23.
On July 9, 2004, following RIDEM's approval of the Revised ELUR, Steeves forwarded an email to Stringer asking her to transmit the Revised ELUR to Ferris Avenue to be executed. See Stringer Dep. Tr. 100:4-101:24, May 19, 2010; Stringer Dep. Ex. 24. On July 12, 2004, Stringer forwarded the Revised ELUR to Gill without copying Garrahy. See Stringer Dep. Tr. 102:2-25, May 19, 2010; Stringer Dep. Ex. 25.
On February 15, 2005, Steeves emailed Stringer and told her that according to Gill, "the ELUR restrictions [were] unacceptable to Ferris Avenue Realty, and therefore the [Revised] *Page 8 
ELUR ha[d] not been executed or sent on to RIDEM." See Steeves Dep. Tr. 66:6-15, Mar. 31, 2009; Steeves Dep. Ex. 22. The email also indicated that Gill had told Steeves that Ferris Avenue intended to subdivide the Property and develop a lot for residential use.See Steeves Dep. Ex. 22.
In or about early 2005, Ferris Avenue began the process of subdividing the Property for the purpose of developing about four and one-half (4 ½) acres of vacant land for residential use (Proposed Residential Development Site). See Gill Dep. Tr. 69:4-9, Jan. 14, 2010; Granoff Dep. Tr. 164:15-165:25, Sept. 29, 2010. Ferris Avenue thereafter retained VHB to investigate and document environmental conditions on the Proposed Residential Development Site. See O'Connor Dep. Tr. 27:11-16, Apr. 3, 2009; O' Connor Dep. Ex. K. Specifically, VHB was hired to "characterize the nature and extent of contamination on the four and a half acre back parcel" that Ferris Avenue sought to develop, to "gather some additional information regarding the underground storage tank release that was previously identified on the [P]roperty," and to "report the results of that relative to the DEM site remediation regulations."See VHB Dep. Tr. 10:12-11:3, Nov. 12, 2010.
In or about September 2005, VHB began work on a SIR for the entire Property. See Ferris Avenue Dep. Tr. 62:4-7, Dec. 14, 2010. On December 20, 2005, VHB submitted a Short Term Response Action Work Plan (STRAWP) to RIDEM indicating that there were elevated concentrations of Hazardous Materials exceeding those allowed by RIDEM under its residential and industrial/commercial standards. See Paul Dep. Tr. 66:5-12, Jan. 21, 2009; Paul Dep. Ex. K; VHB Dep. Tr. 24:11-24, Nov. 12, 2010; RIDEM Dep. Tr. 48:19-25, Dec. 6, 2010. Additionally, the STRAWP informed RIDEM that Ferris Avenue "had the goal of converting the four and a *Page 9 
half acre parcel from industrial to residential use." See VHB Dep. Tr. 24:11-24, Nov. 12, 2010; Paul Dep. Ex. K.
On the following day, RIDEM issued a letter of responsibility (Letter of Responsibility) to Ferris Avenue and Huhtamaki.See Stringer Dep. Tr. 109:16-110:1, May 19, 2010. The Letter of Responsibility indicated, among other things, that "a STRAWP prepared by VHB had identified soil and groundwater exceedances of the Residential Direct Exposure Criteria, as well as the Industrial Commercial Direct Exposure Criteria." See Stringer Dep. Ex. 28. It also noted that an ELUR had yet to be received and required the submission of a complete SIR and a minimum of three (3) remedial alternatives for addressing all soil and groundwater contamination on the Property. Id.
After receiving the Letter of Responsibility, Ferris Avenue directed VHB to begin work on the soil removal and to complete the SIR. See O'Connor Dep. Tr. 27:9-19, Nov. 12, 2010. Following the submission of the SIR, RIDEM issued a letter to the effect that "no further action [was] necessary [on the four and a half acre parcel] as a result of [the] soil removal on that parcel."See O'Connor Dep. Tr. 33:19-24, Nov. 12, 2010.
On February 14, 2006, Plaintiff mailed a Claim Notice to Huhtamaki notifying it of its indemnification claim. See Stringer Dep. Tr. 116:9-12, May 19, 2010; Stringer Dep. Ex. 31. On March 10, 2006, twelve (12) days after the expiration of the Notice Period, Huhtamaki responded to Ferris Avenue's request for indemnification and denied the claim. See Stringer Dep. Tr. 116:23-117:8, May 19, 2010; Stringer Dep. Ex. 32. According to Huhtamaki, Ferris Avenue had failed to give proper notice to Huhtamaki of its demand for indemnification. Id. As a result, Huhtamaki denied any liability under the Indemnity Agreement and refused to pay any costs incurred by Ferris Avenue in connection with the clean-up of the Property. *Page 10 
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in the light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion."Westinghouse Broad. Co., Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980) (internal citations omitted). During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). Moreover, in passing upon a motion for summary judgment under Rule 56, if no genuine issue of material fact exists, the trial justice may determine "`whether the moving party is entitled to judgment under the applicable law.'"Ludwig v. Kowal, 419 A.2d 297, 301 (R.I. 1980) (quotingBelanger v. Silva,114 R.I. 266, 267, 331 A.2d 403, 404 (1975)). "When there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is properly entered." Tangleridge Dev. Corp. v. Joslin,570 A.2d 1109, 1111 (R.I. 1990); Holliston Mills,Inc. v. Citizens Trust Co., 604 A.2d 331, 334 (R.I. 1992) (stating that "summary judgment is proper when there is no ambiguity as a matter of law"). *Page 11 
 III Discussion A First Amended Complaint 1 Count II: Breach of the Indemnity Agreement
Ferris Avenue asserts that Huhtamaki has breached its obligations under the Indemnity Agreement by refusing to indemnify and reimburse it for costs incurred in connection with the clean-up of Hazardous Materials on the Property. Huhtamaki, however, maintains that it is not liable for Ferris Avenue's voluntarily incurred clean-up costs, and that summary judgment is inappropriate given the ambiguity of the Indemnity Agreement.
Contract interpretation is generally a question of law; it is only when contract terms are ambiguous that the construction of its terms becomes a question of fact. See Clark-Fitzpatrick,Inc./Franki Found. Co. v. Gill, 652 A.2d 440, 443 (R.I. 1994);Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980) (explaining that "the construction of a clear and unambiguous contract presents an issue of law which may be resolved by summary judgment"). It is well settled that where the terms of a contract are clear and unambiguous, the court must apply them as they are written.See A.F. Lusi Constr., Inc. v. Peerless Ins. Co.,847 A.2d 254, 258 (R.I. 2004) (citing W.P. Assocs. v. Forcier,Inc., 637 A.2d 353, 356 (R.I. 1994)). In the face of a clear and unambiguous contract, a court should determine its meaning without reference to extrinsic facts or aids. See Gill,652 A.2d at 443 (citing Greenwald v. Selya Iannuccillo,Inc., 491 A.2d 988, 989 (R.I. 1985)). *Page 12 
It is axiomatic that an agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation.W.P. Assocs., 637 A.2d at 356 (citing Gustafson v. Max FishPlumbing Heating Co., 622 A.2d 450, 452 (R.I. 1993);see also Federal Deposit Ins. Corp. v. Singh,977 F.2d 18, 22 (1st Cir. 1992) (stating that "[a] contract is not ambiguous simply because litigants disagree about its proper interpretation"). When determining whether an agreement is clear and unambiguous, the court should "`refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity . . . where none is present.'" Irene Realty Corp. v. TravelersProp. Cas. Co. of Am., 973 A.2d 1118, 1122-23 (R.I. 2009) (quoting Mallane v. Holyoke Mut. Ins. Co. in Salem,658 A.2d 18, 20 (R.I. 1995)). Rather, a court must simply view the document at issue in its entirety and give its language its plain, ordinary, and usual meaning. See Antone v. Vickers,610 A.2d 120, 123 (R.I. 1992); see alsoAndrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004) (stating that every word of a contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected).
Here, Defendant maintains that Ferris Avenue may only assert a claim for indemnification in connection with actions initiated against it by a third party. Further, Huhtamaki contends that Ferris Avenue may only be reimbursed for costs reasonably incurred by it in connection with such mandatory actions. The Court, however, upon review of the entire Indemnity Agreement, finds Huhtamaki's interpretation to be untenable and unreasonable. In fact, despite Huhtamaki's best efforts, the Court finds that the language of the Indemnity Agreement is both clear and unambiguous, and therefore, a construction of the same is ripe for resolution as a matter of law. *Page 13 
Under the Indemnity Agreement, Huhtamaki "covenant[ed] and agree[d] to indemnify, protect[,] and hold harmless [Ferris Avenue] . . . from and against any and all Damages (including without limitation reimbursement of clean-up costs)" directly or indirectly resulting from, among other things:
 "(a) claims, actions or causes of action, including, without limitation, those involving toxic torts and those seeking reimbursement of clean-up costs, which arise out of the handling, treatment, storage, disposal or transportation or arranging thereof, by [Huhtamaki] of any pollutant, contaminant or hazardous substance or toxic substance . . . and which handling, treatment, storage, disposal or transportation or arrangement therefore occurred or began, in whole or in part, on or prior to the Closing, even though such claim, action or cause of action may be made or filed after the Closing;
 ". . .
 ". . .
 "(d) any Release or threat of a Release, actual or alleged, of any Hazardous Substances or oil upon, about or into the Property or respecting any products or materials prior to the Closing located upon, delivered to or in transit to or from the Property whether or not such release or threat of a release occurs as the result of the negligence or misconduct of [Hutamaki] or any third party or otherwise, or
 "(e) any violation actual or alleged, of or any other liability under or in connection with any Environmental Law respecting any products or materials prior to the Closing located upon, delivered to, transported from or in transit to or from the Property whether or not such violation or alleged violation occurs as the result of the negligence of [sic] of [Hutamaki] or any third party or otherwise." See
Def.'s Opp'n Mem. Ex. D § 2 (emphasis added).
In particular, Huhtamaki was obligated to indemnify and reimburse Ferris Avenue for:
 "all liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever *Page 14 
(including, without limitation, reasonable attorneys' fees, consultants' and experts' fees and disbursements incurred in investigating, defending against, settling or prosecuting any claim, litigation or proceeding) which may at any time be imposed upon, reasonably incurred by or asserted or awarded against such Indemnified Party or the Property." Id. § 1(b) (emphasis added).
Therefore, while the Court acknowledges that Ferris Avenue's right to indemnification and recovery is limited, in relevant part, to "reasonably incurred" Damages, Ferris Avenue's right to assert a claim is in no way limited solely to those instances involving a third party action.
Indeed, when section 2 (as set forth above) is read together with section 6, it is abundantly clear that Ferris Avenue's right to recovery is not limited to third party actions. Section 6 expressly sets forth the procedure by which Ferris Avenue may seek indemnification for its own claims against Huhtamaki. It provides:
 "If [Ferris Avenue] should have a claim against [Huhtamaki] hereunder which does not involve a claim or demand being asserted against or sought to be collected from it by a third party, [Ferris Avenue shall send a Claim Notice with respect to such claim to [Huhtamaki]. If [Huhtamaki] disputes such claim, such dispute shall be resolved by litigation in an appropriate court of competent jurisdiction." Id. § 6(c) (emphasis added).
Accordingly, when read as a whole, the Court finds that the Indemnity Agreement not only contemplated, but also specifically provided for, indemnification and reimbursement of Ferris Avenue's own claims for reasonably incurred costs or Damages resulting from the investigation and clean-up of Hazardous Materials discovered on the Property.
Huhtamaki asserts that the Indemnity Agreement was never intended to impose upon it Ferris Avenue's voluntary incurred clean-up costs. However, where, as here, the Court is confronted with a clear and unambiguous contract, the Court finds that the language of the Indemnity Agreement is the best expression of the parties' contractual intent, and therefore, *Page 15 
Huhtamaki's subjective intent is of no moment. SeeVincent Co. v. First Nat'l Supermarkets, Inc.,683 A.2d 361, 363 (R.I. 1996); see also Westinghouse,122 R.I. at 581 n. 10, 410 A.2d at 991 n. 10 (explaining that courts look to the intent expressed in the language of the contract and not to the undisclosed intent that may have existed in the minds of the contracting parties); Cathay Cathay, Inc. v. Vindalu, LLC,962 A.2d 740, 746 (R.I. 2009) (citing Hilton v. Fraioli,763 A.2d 599, 602 (R.I. 2000)) (affirming that unambiguous contract language renders the parties' intent irrelevant).
Consequently, in light of the clear and unambiguous nature of the Indemnity Agreement, the Court grants summary judgment as to Count II of Plaintiff's First Amended Complaint. Furthermore, the Court finds that under the Indemnity Agreement, Huhtamaki is liable for Ferris Avenue's reasonably incurred costs or Damages resulting from the investigation and clean-up of Hazardous Materials discovered on the Property.
 B First Amended Counterclaims 1 Counts I-III: Fraudulent Inducement, Fraudulent Misrepresentation NegligentMisrepresentation
In Counts I, II, and III of its First Amended Counterclaims, Huhtamaki alleges that prior to executing the Subject Agreements, Plaintiff, by and through its agents, fraudulently induced Defendant to enter into the Subject Agreements through intentional or negligent misrepresentations, and as a result, it should not be liable under those agreements. In particular, Huhtamaki argues that Ferris Avenue intentionally or negligently misrepresented that (1) it intended to use the Property only as a warehouse; (2) would not use the Property for residential *Page 16 
purposes; and (3) would abide by whatever restrictions were included in the ELUR approved by RIDEM. Ferris Avenue, however, maintains that Huhtamaki's claims are unsupported and unsubstantiated, improperly relying on mere allegations, conclusions, or opinions, and therefore, seeks summary judgment as to these counterclaims.[6]
To establish a claim of fraudulent misrepresentation, "the plaintiff must prove that the defendant `made a [misrepresentation] intending thereby to induce plaintiff to rely thereon' and that the plaintiff justifiably relied thereon to his or her damage."Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996) (quotingCliftex Clothing Co. v. DiSanto,88 R.I. 338, 344, 148 A.2d 273, 275 (1959)); seealso Asermely v. Allstate Ins. Co.,728 A.2d 461, 463 (R.I. 1999) (stating that a claim of fraudulent misrepresentation requires that a party not only show that the opposing party had an intention to deceive, but also that the aggrieved party detrimentally relied upon the fraudulent representation). Similarly, to prevail on a claim of fraudulent inducement, a party must establish (1) a false representation; (2) knowledge of the statement's falsity; (3) intent to induce reliance; and (4) detrimental reliance. SeeWomen's Dev. Corp. v. City of Cent. Falls,764 A.2d 151, 161 (R.I. 2001); see alsoBourdon's v. Ecin Indus., Inc., 704 A.2d 747, 753 (R.I. 1997) (citing Black's Law Dictionary 661 (6th ed. 1990)) (defining fraudulent inducement as a *Page 17 
"[m]isrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken"). Therefore, claims for fraudulent misrepresentation and fraudulent inducement are essentially identical.
Here, after reviewing the admissible evidence in the light most favorable to the non-moving party, the Court finds that Huhtamaki has failed to set forth specific facts sufficient to establish a genuine issue of material fact, and as a result, these claims are ripe for resolution as a matter of law. See St. PaulFire Marine Ins. Co. v. Russo Bros., Inc.,641 A.2d 1297, 1299 (R.I. 1994) (explaining that when a party opposes summary judgment it has an "affirmative duty to set forth specific facts in order to show that a genuine issue of material fact exists to be decided at trial"); see alsoBourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998) (stating that a non-moving party may not rely on mere allegations in opposing summary judgment, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue of material fact). Further, the Court finds that Huhtamaki has failed to present specific evidence of crucial elements underlying its claims for fraudulent inducement and misrepresentation, and therefore, these counterclaims must fail. See Lavoie v.North East Knitting, Inc., 918 A.2d 225, 228 (R.I. 2007) (quotingCelotex Corp. v. Catrett,477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (construing the substantially similar federal rule)) (stating that summary judgment should enter "`against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. . . .'"); see also Santana v.Rainbow Cleaners, 969 A.2d 653, 657 (R.I. 2009); Holley v.Argonaut Holdings, Inc., 968 A.2d 271, 274 (R.I. 2009). *Page 18 
Indeed, claims for fraudulent misrepresentation and fraudulent inducement require a party to show, among other things, the existence of a misrepresentation[7] and an intention to deceive. Huhtamaki, however, has failed to present any evidence that Ferris Avenue or its agents ever represented to Huhtamaki that it would only use the Property as a warehouse or that it had no intention to use the Property for residential purposes. Rather, the record is replete with evidence indicating that Ferris Avenue neither made these representations nor was considering residential use at the time of the Closing.See Ferris Avenue Dep. Tr. 75:12-17, Sept. 30, 2010 (explaining that Ferris Avenue was not "considering residential use prior to [C]losing"); Gill Dep. Tr. 69:4-9, Jan. 14, 2010 (acknowledging that Ferris Avenue "decide[d] to investigate the possibility of developing a portion of the [P]roperty for residential purposes" in "late 2004"); Granoff Dep. Tr. 164:6-165:4, Sept. 29, 2010 (clarifying that "[a]t the time [Ferris Avenue] closed on the [P]roperty" they were not planning to use it for residential use, but post-Closing a decision was made to investigate "using a portion . . . as residential"); Stringer Dep. Tr. 133:1-134:7, May 19, 2010 (explaining that other than Garrahy's "general discussions about the use of the [P]roperty during the negotiation," no Ferris Avenue representative ever "represent[ed] to [her] that [Ferris Avenue] would use the subject property as a warehouse"); Steeves Dep. Tr. 48:6-24, Mar. 31, 2009 (admitting that "prior to [C]losing, [no one] from Ferris Avenue" told him that "they would never use the [P]roperty or any portion of the [P]roperty for residential purposes"). *Page 19 
Similarly, the documents relating to the purchase of the Property also contradict Huhtamaki's generalized assertions. Upon review of Ferris Avenue's March 3, 2003 offer letter, the Indemnity Agreement, and the Deed, the Court is unable to identify any representation or limitation with regards to the use of the Property as a warehouse or for residential purposes.[8] See Stringer Dep. Tr. 68:25-69:8, 133:15-134:7, May 19, 2010 (acknowledging that neither the deed nor "other documents regarding the [C]losing on th[e] [P]roperty" contained a "restriction on it as far as property usage"); Stringer Dep. Ex. 15; Def.'s Opp'n Mem. Ex. D.
Furthermore, Huhtamaki relies on McCarthy's statement to Steeves — as conveyed in Steeve's May 8, 2003 email to Stringer — to establish that Plaintiff promised to sign any ELUR approved by RIDEM. See Def.'s Opp'n Mem. Ex. K. However, McCarthy's statement is insufficient to establish either a misrepresentation or an intention to deceive. According to Steeves, McCarthy stated "that she planned to advise the buyer that it made no difference to her whether [the ELUR covered] a small area or the whole site." Id. This statement neither acts as nor indicates an intentional misrepresentation by Ferris Avenue. Rather, it merely reflects McCarthy's own opinion as to the scope of the ELUR and that she intended to relay her opinion to Ferris Avenue. Even if McCarthy, as argued by Huhtamaki, could be found to have been exercising the actual, implied, or apparent authority of Ferris Avenue, her statement is simply not an affirmative representation that Ferris Avenue agreed to an expansion of the ELUR. *Page 20 
Likewise, Huhtamaki's counterclaim for negligent misrepresentation must fail. Negligent misrepresentation is a lesser included claim of fraudulent misrepresentation. See Manchester v.Pereira, 926 A.2d 1005, 1012 (R.I. 2007). It differs only in that "while [fraudulent misrepresentation] requires knowledge that the pertinent statement was false, [negligent misrepresentation] merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information." Id. (citing Mallette v.Children's Friend Serv., 661 A.2d 67, 69 (R.I. 1995));see also
37 Am. Jur. 2d Fraud § 128 (2001). As previously indicated, Huhtamaki has failed to provide any evidence that Plaintiff or its agents at any point made an assertion that was not in accordance with the facts at the time it was made. There is simply no evidence before this Court that would indicate that Ferris Avenue ever represented to Huhtamaki that it (1) intended to use the Property only as a warehouse; (2) would not use the Property for residential purposes; or (3) would abide by whatever restrictions were included in the ELUR approved by RIDEM.[9]
Therefore, where, as here, Huhtamaki has failed to establish a genuine issue of material fact, the Court finds these counterclaims ripe for resolution as a matter of law. Having failed to establish the existence of elements essential to its claims, it follows that Defendant's fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation counterclaims must fail. *Page 21 
 4 Count IV: Breach of Contract
Huhtamaki contends that Plaintiff has breached the Indemnity Agreement by failing to (1) provide Huhtamaki with the requisite Claim Notice; (2) abide by the terms of the ELUR; and (3) file the ELUR as required by RIDEM's regulations. Conversely, Ferris Avenue contends that it has not violated the clear and unambiguous provisions of the Indemnity Agreement, and therefore, it is entitled to summary judgment with respect to this claim.
"Generally, whether a party materially breached his or her contractual duties is a question of fact." Parker v. Byrne,996 A.2d 627, 632 (R.I. 2010) (citing Women's Dev. Corp.,764 A.2d at 158). "If the issue of material breach, however, `admits of only one reasonable answer, then the court should intervene and resolve the matter as a question of law.'" Id.; but cf.Trainor v. The Standard Times, 924 A.2d 766, 769 (R.I. 2007) (citing Tedesco v. Connors, 871 A.2d 920, 927 (R.I. 2005)) (stating that "the trial justice must deny the motion if there are factual issues concerning which reasonable persons may draw different conclusions"). Here, the Court finds that the particular sequence of facts and events admit of only one reasonable disposition, and thus, will proceed to resolve the breach of contract counterclaim as a matter of law.
Considering the evidence as a whole and in a light most favorable to Huhtamaki, the Court finds as a matter of law that Ferris Avenue has not breached the Indemnity Agreement. As a threshold matter, the Court cannot overlook the fact that the Indemnity Agreement was clearly given by Huhtamaki "for the benefit of Ferris Avenue" and "in order to induce [Ferris Avenue] to purchase the Property."See Def.'s Opp'n Mem. Ex. D. Although Huhtamaki contends that Ferris Avenue breached the Indemnity Agreement by failing to execute and file the ELUR approved by RIDEM, the Indemnity Agreement's clear and unambiguous language neither *Page 22 
required nor obligated Ferris Avenue to execute or agree to any proposed ELUR. Rather, under the express terms of the Indemnity Agreement, Huhtamaki itself "retain[ed] responsibility for any investigation or remediation measures required by [RIDEM] that exist[ed] at the time of Closing" and specifically agreed to "finalize the Environmental Land Use Restriction agreement."Id.
Huhtamaki also asserts that Ferris Avenue's refusal to execute or file an ELUR interfered with Huhtamaki's ability to perform its own obligations under the Indemnity Agreement, and therefore, Ferris Avenue is liable for breach of contract. See Demicco v.Medical Assocs. of R.I., Inc., No. 99-251L,2000 WL 1146532, *2 (D.R.I. 2000) (quotingBlack's Law Dictionary 182 (7th ed. 1999) (explaining that to establish a breach of contract claim, a party must provide evidence that there has been a "`violation of a contractual obligation, either by failing to perform one's promise or by interfering with another party's performance'"). The Court, however, is unconvinced. Here, the evidence before the Court plainly indicates that Ferris Avenue's execution of the Revised ELUR was not the only means by which Huhtamaki could have fulfilled its ELUR obligation under section 3. The record clearly reflects that RIDEM required an expanded residential use restriction as a result of Huhtamaki's failure to submit a SIR for the entire Property. See Ferris Avenue Dep. Tr. 23:21-24, Dec. 14, 2010.
Huhtamaki, itself, knew that RIDEM had requested that "the ELUR . . . be placed on the entire lot since a Site Investigation Report [had] not [been] completed for the entire site." See Steeves Dep. Exs. 10-11. However, rather than submit a SIR for the entire Property, Steeves told Stringer that he felt it "would be a lot cheaper to broaden the ELUR than to compile a site-wide report, and if it makes no difference to the buyer, I can't see why we'd spend the money." Id. Indeed, neither Huhtamaki nor its employees later confirmed Ferris Avenue's approval of a site-wide *Page 23 
restriction.[10] Instead, Huhtamaki avoided the costs of completing a SIR on the entire Property, thereby imposing them on Ferris Avenue who would be subjected to a site-wide use restriction. Consequently, the Court finds that Huhtamaki had alternative means by which to satisfy its section 3 obligations and ensure an ELUR was completed to both RIDEM and Ferris Avenue's satisfaction, and therefore, Huhtamaki may not now argue that Ferris Avenue breached the Indemnity Agreement by failing to execute the Revised ELUR.
The Court similarly disagrees with Huhtamaki's contention that Ferris Avenue failed to provide it with the requisite Claim Notice. Where, as here, Ferris Avenue has asserted "a claim against [Huhtamaki] which does not involve a claim or demand being asserted against or sought to be collected from it by a third party," Ferris Avenue was merely required to "send a Claim Notice with respect to such claim to [Huhtamaki]." See Def.'s Opp'n Mem. Ex. D § 6(c). Unlike those instances in which Ferris Avenue was notifying Huhtamaki of a claim asserted against it by a third party, section 6(c) does not contain a requirement of "reasonable *Page 24 
promptness" or that Ferris Avenue "specify[] the nature of and specific basis for such claim or demand and the amount or the estimated amount thereof." Id. § 6(a).
Although Huhtamaki maintains that section 6(c) only provides for indemnification or reimbursement of costs reasonably incurred by the Plaintiff as a result of a mandatory action, as previously indicated, neither section 6(c) nor the Indemnity Agreement as a whole, limit Ferris Avenue's right to indemnification to mandatory actions or claims asserted solely by third parties. As a result, the Court finds that the February 14, 2006 letter from Garrahy to Huhtamaki fulfilled the notice requirements as specified by section 6(c) of the Indemnity Agreement, and as a result, Ferris Avenue remains entitled to indemnification for the Damages "reasonably incurred" for the clean-up of the Property.
In light of the foregoing, the Court finds that Ferris Avenue has not breached the Indemnity Agreement. The Court grants summary judgment to Ferris Avenue with respect to Count IV of Huhtamaki's First Amended Counterclaim.
 5 Count V: Breach of the Implied Covenant of Good Faith and FairDealing
Huhtamaki asserts that under the Indemnity Agreement, Plaintiff was required to act with good faith and to deal fairly with Defendant. It argues that Plaintiff breached the implied covenant by (1) failing to cooperate with Defendant in its efforts to perform its contractual obligations to finalize the ELUR with RIDEM; (2) failing to adequately and promptly notify Defendant pursuant to section 6 of the Indemnity Agreement of a claim that could give rise to Defendant's obligation to indemnify Plaintiff; (3) acting in contravention of the ELUR residential restriction by attempting to have the classification of the Property changed from non-residential *Page 25 
commercial to residential usage; and (4) failing to execute or file the ELUR approved by RIDEM as it was required to do by RIDEM's regulations.
It is well-settled in Rhode Island that "`virtually every contract contains an implied covenant of good faith and fair dealing between the parties.'" Dovenmuehle Mortg., Inc. v. Antonelli,790 A.2d 1113, 1115 (R.I. 2002) (quoting Centerville Builders,Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). Such a covenant ensures that contractual objectives are achieved. IdeFarm Stable, Inc. v. Cardi, 297 A.2d 643, 644-45 (1972). Therefore, "`a party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith.'" Hord Corp. v. Polymer ResearchCorp. of Am., 275 F. Supp. 2d 229, 238 (D.R.I. 2003) (quotingThompson Trading, Ltd. v. Allied Breweries Overseas TradingLtd., 748 F. Supp. 936, 942-43 (D.R.I. 1990)).
As previously set forth, it is clear from the plain and unambiguous language of the Indemnity Agreement that the contractual objectives of that agreement and the covenants contained therein were made for Ferris Avenue's benefit. Further, in light of the Court's findings, and for the reasons contained herein, the Court finds that Ferris Avenue's actions in connection with the ELUR and its claim for indemnification were not in violation of the implied covenant of good faith and fair dealing, and thus, the Court grants Plaintiff's motion for summary judgment as to Count V of Huhtamaki's First Amended Counterclaim.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that the Indemnity Agreement, when read as whole, clearly and unambiguously provides for the indemnification and *Page 26 
reimbursement of damages reasonably incurred by Ferris Avenue in connection with its clean-up of the Property. Moreover, the Court finds that Huhtamaki has failed to proffer sufficient evidence to establish that Ferris Avenue either made fraudulent or negligent misrepresentations to Huhtamaki or fraudulently induced it to enter into the Subject Agreements. Further, the Court finds that Ferris Avenue neither breached the terms of the Indemnity nor acted in violation of the implied covenant of good faith and fair dealing. As a result, the Court grants Ferris Avenue's motion for summary judgment as to liability for Count II of its First Amended Complaint and on all counts of Huhtamaki's First Amended Counterclaims.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record. Counsel shall also arrange for a time to meet with the Court for the purpose of scheduling such further proceedings, if any, as may be appropriate under the circumstances.
[1] According to a 2003 Site Investigation Report (SIR), the No. 6 fuel oil soil contamination was likely the result of a leak originally observed during the removal of an underground storage tank in 1986. See Stringer Dep. Ex. 11. The SIR also indicated that "[r]esidual No. 6 fuel oil remain[ed] in the soils near the Boiler Room at the southeast side of the building, following removal of an underground storage tank in November 2002." Id.;see also RIDEM Dep. Tr. 15:6-23, Dec. 6, 2010.
[2] Capitalized terms, unless otherwise defined herein, have the meaning assigned to them in the Indemnity Agreement.
[3] "`Damages' shall mean any and all liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys' fees, consultants' and experts' fees and disbursements incurred in investigating, defending against, settling or prosecuting any claim, litigation or proceeding) which may at any time be imposed upon, reasonably incurred by or asserted or awarded against such Indemnified Party or the Property."See Stringer Dep. Ex. 14 § 1(b).
[4] According to Ferris Avenue, RIDEM wanted an ELUR to be placed on the entire Property because a SIR had not been performed on the entire Property. See Ferris Avenue Dep. Tr. 32:19-24, Dec. 14, 2010.
[5] The Court notes that before purchasing the Property, Ferris Avenue retained Vanasse, Hangen, Brustlin, Inc. (VHB), an environmental engineering firm, to "collect soil samples around some electrical transformers, former locations of electrical transformers, review some records, environmental records associated with the [P]roperty and to provide some consultation relative to the [P]roperty transaction. . . ." See VHB Dep. Tr. 7:2-11, Nov. 12, 2010.
[6] Ferris Avenue also contends — as preserved in its Affirmative Defenses to Defendant's First Amended Counterclaims — that Huhtamaki has failed to meet the particularity requirements of Super. R. Civ. P. 9(b), and therefore, its fraud counterclaims should be dismissed. While the Court acknowledges that Huhtamaki has failed to plead its counterclaims with the requisite specificity required by Rule 9(b), for the reasons set forth below, the Court need not summarily dispose of the matter merely on technical grounds. See Super. R. Civ. P. 9(b); Robert B. Kent, et al., Rhode Island Civil and AppellateProcedure, § 9:2 (West 2006); see alsoFeinstein v. Resolution Trust Corp.,942 F.2d 34, 42-43 (1st Cir. 1991) (explaining that Rule 9(b) requires the pleader to specify the time, place, and content of the alleged false or fraudulent representations); seealso Powers v. Boston Cooper Corp.,926 F.2d 109, 111 (1st Cir. 1991) (quoting Lopez v. Bulova WatchCo., Inc., 582 F. Supp. 755, 766 (D.R.I. 1984)) (stating that when a fraud count is conclusory and lacking in specifics, it is too vague to meet the requirements of Rule 9(b)).
[7] A misrepresentation is "`any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.'"Halpert v. Rosenthal,107 R.I. 406, 413, 267 A.2d 730, 734 (1970) (quoting Restatement (First) Contracts § 470 at 890-91 (1932)).
[8] Notably, where, as here, a deed includes the words "with quitclaim covenants," the grantor is obliged to warrant and defend the property conveyed to the grantee against all claims on the property made through the grantor. See
G.L. 1956 §§ 34-11-17 and 34-11-18; see alsoFinnegan v. L.K. Goodwin Co., Inc.,768 A.2d 422, 425 (R.I. 2001). Further, once a deed is delivered, it generally becomes the final statement of the parties and nullifies all provisions of the purchase and sales agreement. SeeLizotte v. Michelle, 771 A.2d 884, 887 (R.I. 2001);Russo v. Cedrone,118 R.I. 549, 557-58, 375 A.2d 906, 910 (R.I. 1977) (noting that once a "deed [is] accepted, it ha[s] the effect of superceding any provisions of the purchase and sale agreement which may [be] in conflict with it").
[9] Even if the Court were to find that Plaintiff or its agents made representations as to their future use of the Property or acceptance of the ELUR, generally, these representations would not be actionable because a claim sounding in fraud must be based on a false representation of an existing fact. See Grassi v.Gomberg, 81 R.I. 302, 304-05, 102 A.2d 523, 524-25 (R.I. 1954) (affirming that a "false representation must be of an existing fact"). Only where a party establishes a promise to act in the future and a present intention not to fulfill that act or to deceive, may that party have an action for fraud. Id. Here, however, Huhtamaki has failed to proffer any evidence that Plaintiff or its agent did not intend to abide by any representations made during their negotiations or at the time of the Closing.
[10] Through its review of the evidence, the Court has observed several notable incidents which appear to comprise a pattern of questionable actions and miscommunications — be they intentional or not — by which Huhtamaki misled Ferris Avenue and failed to keep it accurately apprised as to the status of the ELUR. Indeed, on August 20, 2003, despite RIDEM's earlier expansion of the Proposed ELUR, Stringer "mistakenly" forwarded the Proposed ELUR (containing a residential use restriction on only the Affected Parcel) to Garrahy for Ferris Avenue's approval. See Stringer Dep. Tr. 88:3-93:5, May 19, 2010; Stringer Dep. Exs. 18-20. On December 24, 2003 and January 26, 2004, copies of the Revised ELUR (which included the expanded residential use restriction) were sent to RIDEM for review and approval, without also being sent to or approved by Ferris Avenue, its counsel, or any of its representatives. See McCarthy Dep. Tr. 42:8-18, Jan. 6, 2009; Stringer Dep. Tr. 95:11-97:18, 97:23-99:9, May 19, 2010; Stringer Dep. Exs. 22-23. Lastly, on July 12, 2004, following RIDEM's approval of the Revised ELUR, Stringer sought Ferris Avenue's approval of the Revised ELUR by forwarding a copy to Gill, a Ferris Avenue employee, and not, Garrahy, its counsel. See Stringer Dep. Tr. 102:2-25, May 19, 2010; Stringer Dep. Ex. 25. *Page 1